IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| Altisource Asset Management Corporation, <br><br> *Plaintiff,* <br><br> v. <br><br> Luxor Capital Group, LP; Luxor Capital Partners Offshore Master Fund, LP; Luxor Capital Partners, LP; Luxor Wavefront, LP; Luxor Spectrum, LLC; Thebes Offshore Master Fund, LP, <br><br> *Defendants.* | Civil No. 2020/ 29 /CV <br><br> ACTION FOR DECLARATORY JUDGMENT |

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW the Plaintiff, Altisource Asset Management Corporation ("AAMC"), by and through undersigned counsel, and brings this complaint against Defendants Luxor Capital Group, LP ("Luxor"); Luxor Capital Partners Offshore Master Fund, LP; Luxor Capital Partners, LP; Luxor Wavefront, LP; Luxor Spectrum, LLC; and Thebes Offshore Master Fund, LP (together, "Defendants"), and states and alleges as follows:

### INTRODUCTION

1.     This dispute relates to the proper interpretation of a certificate of designations of a U.S. Virgin Islands ("USVI") company pursuant to which Defendants chose to purchase preferred shares of the USVI company.

EXHIBIT

B

2.      Plaintiff AAMC is a USVI asset management company. Defendant Luxor is a New York hedge fund. Every other Defendant, all Luxor entities, are individual funds or accounts managed and/or controlled by Luxor and/or Luxor's Chief Executive Officer.

3.      In March 2014, AAMC and Defendants entered into an agreement pursuant to which AAMC sold its Series A Convertible Preferred Stock ("Series A Shares"), par value $.01 per share, to Defendants. Defendants currently own 144,212 Series A Shares.

4.      Defendants' Series A Shares are governed by the Certificate of Designations ("Certificate"), filed pursuant to §§ 91–97 of the General Corporate Law ("GCL") of the USVI, which details the rights and obligations of AAMC and Series A Shareholders, as well as the limits on those rights and obligations.[1]   The Certificate is part of AAMC's Amended and Restated Articles of Incorporation.

5.      § 5 of the Certificate sets out the procedures, including the requirements for and limitations on, the redemption of Series A Shares. One express limitation on AAMC's obligation to redeem Series A Shares at the request of a Series A Shareholder is that AAMC may redeem only "*out of funds legally available therefor, all, but not less than all,*" of the Series A Shares. (Exhibit A, Certificate, § 5(b) (emphasis added).)

6.      Defendants have informed AAMC that they believe they have the right to require early redemption of all of their Series A Shares, and that they reserve all of their rights to obtain that result.

7.      AAMC does not have sufficient "legally available" funds to redeem "all, but not less than all," of Defendants' Series A Shares. AAMC thus does not intend to redeem Defendants'

---

[1]      A true and correct copy of the Certificate is attached hereto as Exhibit A.

2

Series A Shares because, without such funds, AAMC has no obligation to do so under § 5(b) of the Certificate.

8.     An actual and justiciable controversy has arisen and now exists concerning the parties' rights and obligations under the Certificate.

9.     This Court has the authority to issue a declaratory judgment setting out the parties' rights and obligations under the Certificate. 5 V.I.C. § 1261–63.

10.    AAMC seeks a declaratory judgment concerning its redemption obligations under § 5(b) of the Certificate.  Specifically, AAMC seeks a declaration that, under § 5(b) of the Certificate, for AAMC to be obliged to redeem any of a Shareholder's Series A Shares, AAMC must have sufficient funds "legally available" to redeem "all, but not less than all," of the Shareholder's Series A Shares.  (*See* Exhibit A, Certificate, § 5(b).)

11.    AAMC further seeks a declaration that, because AAMC does not have sufficient "legally available" funds to redeem "all, but not less than all," of Defendants' Series A Shares on the first date for redemption at the option of the Series A Shareholders, AAMC has no obligation to redeem any of Defendants' Series A Shares on such date.

## PARTIES

12.    Plaintiff AAMC is a corporation organized under the GCL of the USVI.  AAMC is an asset management company that provides asset and portfolio management services and corporate governance advice.  AAMC maintains its headquarters and principal place of business at 5100 Tamarind Reef, Christiansted, United States Virgin Islands 00820.

13.    Defendants purchased Series A Shares from AAMC on March 18, 2014. Defendants currently own 144,212 Series A Shares.

3

14.     Defendant Luxor is a New York hedge fund with its principal place of business at 1114 6th Avenue, New York, New York 10036.  Luxor invests heavily in the finance sector, with a focus on global debt and distressed companies.  Christian A. Leone founded Luxor and is Luxor's CEO.  Mr. Leone also is an officer, manager, director, and/or controlling person of every other Defendant.  A partner of Luxor was a member of AAMC's Board of Directors from June 2014 to June 2019.

15.     Defendant Luxor Capital Partners Offshore Master Fund, LP is a Cayman Islands exempted limited partnership, which maintains its principal place of business at Maples Corporate Services Ltd., PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands.  Luxor is the investment manager of Luxor Capital Partners Offshore Master Fund, LP, and Mr. Leone is one of its directors.  Mr. Leone also is the Manager of LCG Holdings, LLC, which is Luxor Capital Partners Offshore Master Fund, LP's general partner. Luxor Capital Partners Offshore Master Fund, LP currently owns 73,506 Series A Shares.

16.     Defendant Luxor Capital Partners, LP is a Delaware limited partnership, which maintains its principal place of business at 1114 6th Avenue, New York, New York 10036.  Luxor is the investment manager of Luxor Capital Partners, LP, and Mr. Leone is the Executive Officer of Luxor Capital Partners, LP.  Mr. Leone also is the Manager of LCG Holdings, LLC, which is Luxor Capital Partners, LP's general partner.  Luxor Capital Partners, LP currently owns 52,080 Series A Shares.

17.     Defendant Luxor Wavefront, LP is a Delaware limited partnership, which maintains its principal place of business at 1114 6th Avenue, New York, New York 10036.  Luxor is the investment manager of Luxor Wavefront, LP, and Mr. Leone is the Executive Officer of

4

Luxor Wavefront, LP. Mr. Leone also is the Manager of LCG Holdings, LLC, which is Luxor Wavefront, LP's general partner. Luxor Wavefront, LP currently owns 15,268 Series A Shares.

18.     Defendant Luxor Spectrum, LLC is a Delaware limited liability company, which maintains its principal place of business at 1114 6th Avenue, New York, New York 10036. Mr. Leone is the Executive Officer of Luxor Spectrum, LLC and also is the Manager of LCG Holdings, LLC, which is Luxor Spectrum, LLC's managing member. Luxor Spectrum, LLC currently owns 326 Series A Shares.

19.     Defendant Thebes Offshore Master Fund, LP is a Cayman Islands limited partnership, which maintains its principal place of business at Maples Corporate Services Ltd., PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. Luxor is the investment manager of Thebes Offshore Master Fund, LP, and Mr. Leone is the Manager of LCG Holdings, LLC, which is Thebes Offshore Master Fund, LP's general partner. Thebes Offshore Master Fund, LP currently owns 3,032 Series A Shares.

## JURISDICTION AND VENUE

20.     Each Defendant acquired Series A Shares of AAMC, a USVI corporation.

21.     The Court has subject matter jurisdiction over this civil action under 4 V.I.C. § 76(a), which confers "original jurisdiction in all civil actions regardless of the amount in controversy."

22.     The Court has jurisdiction over Defendants under the USVI long-arm statute, 5 V.I.C. § 4903(a)(1), because Defendants purposefully and voluntarily "transact[ed] . . . business in" the USVI with a company incorporated under USVI law.

23.     The USVI long-arm statute authorizes the exercise of jurisdiction to the fullest extent permissible under the Due Process Clause of the U.S. Constitution. Jurisdiction under 5

V.I.C. § 4903(a)(1) requires only a single act which amounts to the transaction of business within the USVI. Defendants' purchase of the Series A Shares from a USVI corporation is such an act.

24.    Additionally, Article XI of AAMC's Third Amended and Restated Bylaws ("Amended Bylaws"), which govern the sale of all AAMC stock, including the Series A Shares, designates this Court as "the sole and exclusive forum" for actions disputing "any certificate of designations for any series of preferred stock of [AAMC]." (Exhibit B, Amended Bylaws, Article XI.)[2]

25.    The Court has the power to grant a declaratory judgment under 5 V.I.C. § 1261, which gives the Court the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."

26.    The Court's declaratory judgment power specifically includes "determin[ing] any question of construction or validity arising under . . . [a] contract" and providing "a declaration of

---

[2]    A true and correct copy of the Amended Bylaws is attached hereto, as Exhibit B. The relevant subsection of Article XI provides in full:

> The Superior Court of the U.S. Virgin Islands (or, if the Superior Court does not have jurisdiction, another U.S. Virgin Islands court or, if no U.S. Virgin Islands court has jurisdiction, the United States District Court of the Virgin Islands - St. Croix Division) *shall be the sole and exclusive forum for the following matters*, in all cases subject to the court's having personal jurisdiction over all indispensable parties named as defendants:
>
> . . .
>
> (iii)    any action asserting a claim against the Corporation or any of its current or former directors, officers or other employees arising pursuant to any provision of (x) the General Corporation Law of the U.S. Virgin Islands, (y) the Amended and Restated Articles of Incorporation of the Corporation, *including without limitation any certificate of designations for any series of preferred stock of the Corporation, or (z) these Bylaws (in each case (x) through (z), as may be amended from time to time)*."

(emphases added).

rights, status or other legal relations thereunder." 5 V.I.C. § 1262. The Court is expressly empowered to issue a declaratory judgment construing a contract "either before or after there has been a breach thereof." 5 V.I.C. § 1263.

27.     The declaratory judgment provisions of 5 V.I.C. § 1261–63 are "to be liberally construed and administered." 5 V.I.C. § 1270.

28.     This action is ripe for a declaratory judgment because Defendants have informed AAMC that they believe they have the right to require AAMC to redeem all of their Series A Shares, and that they reserve all of their rights to obtain that result.

29.     Venue is proper in this Division under 4 V.I.C. § 78 because "the cause of action arose" in this Division as AAMC is based in Christiansted, St. Croix, and Defendants purchased AAMC's Series A Shares.

30.     Venue also is proper in this Division under the aforementioned Article XI of the Amended Bylaws. (Exhibit B, Amended Bylaws, Article XI.)

## STATUTORY BACKGROUND

31.     AAMC is incorporated under the USVI GCL.

32.     The Certificate pursuant to which AAMC issued the Series A Shares was drafted in accordance with USVI GCL §§ 91–97, the provisions of which govern the issuance and redemption of preferred stock. *See* 13 V.I.C. §§ 91–97.

33.     GCL § 91 grants corporations the right to issue "one or more classes of stock," which may have "voting powers, full or limited, or without voting powers," as well as "other special rights, and qualifications, limitations, or restrictions," all of which must be set out in the corporation's articles of incorporation or a resolution of the corporation's board of directors providing for the issuance of such stock. 13 V.I.C. § 91.

34.     Under GCL § 92, preferred stock "may be made subject to redemption at such time"
and "at such price . . . [with] qualifications, limitations or restrictions" that must also be "stated
and expressed in the articles of incorporation" or the "resolutions providing for the issue of such
stock adopted by the board of directors." 13 V.I.C. § 92. Such stock also "may be made
convertible into, or exchangeable for, shares of any other class" at the rates set out in the
corporation's articles of incorporation or a resolution of the corporation's board of directors
providing for the issuance of such stock. 13 V.I.C. § 95.

35.     In addition, under GCL § 223(a)(3), redemption of "any preferred or special shares"
also is to be carried out as "stated or expressed in" the corporation's articles of incorporation or a
resolution of the corporation's board of directors. 13 V.I.C. § 223(a)(3).

36.     A preferred shareholder's redemption right is not absolute. GCL § 223(a)(3)
expressly limits the funds available for redemption of preferred shares to "surplus" funds.[3] GCL
§ 223(a)(3) provides that "the effect of any . . . redemption . . . shall not be to reduce th[e] actual
value of [the corporation's] assets to an amount less than the total amount of its debts and liabilities
plus the amount of its capital reduced by the amount of capital" used to redeem the preferred
shares. 13 V.I.C. § 223(a)(3).

37.     Because redemption of preferred shares is to be carried out as "stated or expressed
in" the corporation's articles of incorporation or a resolution of the corporation's board of

---

[3]     GCL § 100 defines "surplus" funds as "[t]he excess . . . of the total net assets of the
corporation over the amount . . . [of] capital." 13 V.I.C. § 100. The "capital of any corporation
having capital stock," in turn, is "an amount at least equal to the sum of the aggregate par value of
all issued shares having par value, plus the aggregate amount of the purchase price received by the
corporation for the issue of shares without par value, plus such amounts as, from time to time, by
resolution of the board of directors, may be transferred thereto." *Id.*

directors, 13 V.I.C. § 223(a)(1), a preferred shareholder's redemption right may be further limited by the terms of such articles or resolution.

38.     Here, the Certificate was adopted by resolution of AAMC's Board of Directors on March 12, 2014, and is part of AAMC's Amended and Restated Articles of Incorporation. § 5 of the Certificate details the requirements and procedures for redeeming Series A Shares and further limits the circumstances under which Series A Shares may be redeemed.

## STATEMENT OF FACTS

### A.     AAMC Common Stock

39.     AAMC's common stock trades on the New York Stock Exchange under the ticker symbol "AAMC."

40.     The price of AAMC's common stock reached a high of $1,196.36 per share on January 15, 2014.

41.     On January 24, 2020, AAMC's common stock closed at a price of $13.20 per share.

42.     As of October 30, 2019, 1,598,262 shares of AAMC's common stock were outstanding (excluding 1,298,665 shares held as treasury stock).

### B.     The Series A Shares Private Placement

43.     On March 18, 2014, AAMC closed a private placement for the issuance and sale of 250,000 of its Series A Shares to a series of investors.

44.     The private placement raised a total of $250,000,000.

45.     AAMC intended to use the proceeds of the private placement to repurchase shares of its common stock and for other corporate purposes. In connection with the foregoing, AAMC's Board of Directors approved a share repurchase program that authorized AAMC to repurchase up to $300,000,000 in shares of AAMC's common stock.

46.    Defendants purchased Series A Shares on March 18, 2014, and currently own 144,212 Series A Shares:

a.    Luxor Capital Partners Offshore Master Fund, LP currently owns 73,506 Series A Shares.

b.    Luxor Capital Partners, LP currently owns 52,080 Series A Shares.

c.    Luxor Wavefront, LP currently owns 15,268 Series A Shares.

d.    Luxor Spectrum, LLC currently owns 326 Series A Shares.

e.    Thebes Offshore Master Fund, LP currently owns 3,032 Series A Shares.

47.    The Certificate creates the Series A Shares and details the rights and obligations of AAMC and the holders of the Series A Shares, as well as the limits on those rights and obligations.

48.    The Certificate was adopted by resolution of AAMC's Board of Directors on March 12, 2014, and is part of AAMC's Amended and Restated Articles of Incorporation.

49.    AAMC filed the Certificate with the Office of the Lieutenant Governor, Division of Corporations and Trademarks of the USVI, on March 18, 2014.

50.    AAMC also filed a Form 8-K describing the private placement of Series A Shares with the U.S. Securities and Exchange Commission on March 18, 2014.

C.    **The Redemption Rights of Series A Preferred Shareholders**

51.    The Certificate provides Series A Preferred Shareholders with two key rights. Series A Preferred Shareholders may: (1) convert their Series A Shares to AAMC common stock subject to the terms and conditions of the Certificate (Exhibit A, Certificate, § 6); or (2) redeem their Series A Shares subject to the terms and conditions of the Certificate (*id.* § 5(b)).

52.    Under the Certificate, AAMC is required to redeem all outstanding Series A Shares on March 15, 2044 ("Mandatory Redemption Date") out of legally available funds. (*Id.* § 5(c)).

53.     Prior to the Mandatory Redemption Date, § 5 of the Certificate sets out procedures, as well as requirements and limitations, for AAMC to redeem Series A Shares at its option, and for Series A Shareholders to require that AAMC redeem Series A Shares, beginning on March 15, 2020, and on each successive five-year anniversary of March 15, 2020 ("Early Redemption Date").

54.     Series A Shares may only be redeemed through the procedures, and subject to the requirements and limitations, set out in § 5 of the Certificate.

55.     Under § 5(a) of the Certificate, AAMC may, at its option, "redeem for cash . . . , *out of funds legally available therefor, all, but not less than all*," of the Series A Shares held by a Series A Shareholder by "providing written notice" "within fifteen (15) Business Days (but not more than thirty (30) Business Days )" prior to an Early Redemption Date of AAMC's intent to redeem the Shares. (*Id.* § 5(a) (emphasis added).)

56.     AAMC does not intend to redeem any Series A Shares at its option at the first Early Redemption Date of March 15, 2020.

57.     Under § 5(b) of the Certificate, a Series A Shareholder, may "require [AAMC] to redeem *all* of its outstanding Series A Preferred Shares by providing written notice to [AAMC] within fifteen (15) Business Days (but not more than thirty (30) Business Days)" prior to an Early Redemption Date of the Shareholder's intent to redeem all of its Series A Shares. (*Id.* § 5(b) (emphasis added).) For the first Early Redemption Date of March 15, 2020, that notice period runs from January 31, 2020 to February 24, 2020. AAMC then shall, "within fifteen (15) Business Days of receipt" of such Series A Shareholder notice, provide a notice to the Shareholder "specifying the date set for such redemption, which date shall be no more than thirty (30) Business Days" after receipt of the Shareholder's notice. (*Id.*)

11

58.     Critically, § 5(b) of the Certificate contains an express limitation on AAMC's obligation to redeem Series A Shares at the request of a Series A Shareholder.  Specifically, § 5(b) provides that, on an Early Redemption Date, AAMC shall redeem only "for cash" "*out of funds legally available therefor, all, but not less than all*, of the outstanding Series A Preferred Shares held by" a Series A Shareholder "at an amount equal to the Redemption Price."  (*Id.* (emphasis added).)[4]

59.     § 2 of the Certificate defines "Redemption Price" as "the product of (a) the number of Series A Preferred Shares held by" a Series A Shareholder and "(b) the Liquidation Preference." (*Id.* § 2.)  "Liquidation Preference," in turn, has "the meaning set forth in Section 4(a)" of the Certificate (*id.*), which is "$1,000 per Series A Preferred Share" (*id.* § 4(a)).

---

[4]     § 5(b) of the Certificate provides in full:

> Each holder, at its option, shall have the right, in its sole discretion, to require the Corporation to redeem all of its outstanding Series A Preferred Shares by providing written notice to the Corporation within fifteen (15) Business Days (but not more than thirty (30) Business Days) prior to a Redemption Date of its intent to cause the Corporation to redeem such holder's Series A Preferred Shares on such Redemption Date (each, a "*Holder Redemption Notice*") which will specify (i) the name of the holder delivering such Holder Redemption Notice and (ii) that such holder is exercising its option, pursuant to this Section 5, to require the Corporation to redeem shares of Series A Preferred Shares held by such holder. The Corporation shall, within fifteen (15) Business Days of receipt of such Holder Redemption Notice, deliver to the holder exercising its rights to require redemption of the Series A Preferred Shares a notice specifying the date set for such redemption, which date shall be no more than thirty (30) Business Days after the Holder Redemption Notice (the "*Holder Redemption Date*"). The Corporation shall redeem for cash on the Holder Redemption Date, out of funds legally available therefor, all, but not less than all, of the outstanding Series A Preferred Shares held by such holder at an amount equal to the Redemption Price.

(Exhibit A, Certificate, § 5(b).)

60.     There is no provision in the Certificate under which AAMC is permitted or obliged to redeem only a portion of a Series A Shareholder's Shares.

**D.     AAMC Cannot Redeem "All, But Not Less Than All," of Defendants' Series A Shares**

61.     Defendants have informed AAMC that they believe they have the right to require AAMC to redeem all of Defendants' Series A Shares on the first Early Redemption Date, March 15, 2020.

62.     To redeem all of Defendants' Series A Shares, AAMC would be required to redeem 144,212 Series A Shares at $1,000 per Share for a total of $144,212,000.

63.     AAMC has nowhere near the $144,212,000 in "legally available" funds required to redeem "all, but not less than all," of Defendants' Series A Shares.

64.     AAMC thus is not required to redeem any of Defendants' Series A Shares at the first Early Redemption Date of March 15, 2020, under the terms of the Certificate, which are binding under GCL § 92.

65.     AAMC is further limited in its ability and obligation to redeem Defendants' Series A Shares by GCL § 223(a), which permits redemption of preferred shares only from "surplus" funds.

66.     AAMC has nowhere near the $144,212,000 in "surplus" funds required to redeem "all, but not less than all," of Defendants' Series A Shares.

67.     AAMC thus is not required to redeem any of Defendants' Series A Shares at the first Early Redemption Date of March 15, 2020 under GCL § 223(a).

68.     Moreover, corporations are not required to redeem preferred shares, if, by so doing, the corporation's ability to continue as a going concern is imperiled.  This would be the case were AAMC to be required to redeem all of Defendants' Series A Shares, a fact of which Defendants

are no doubt aware, as they know that the proceeds of the private placement of Series A Shares were already used by AAMC to, among other things, purchase common equity. Defendants approved AAMC's press release announcing the private placement of Series A Shares and the intent to use the proceeds to purchase common equity. Moreover, a partner of Luxor was a member of AAMC's Board of Directors when many of the purchases of common equity occurred.

69.     In addition to the requirements that redemption of "all, but not less than all," of Defendants' Series A Shares be paid from "funds legally available therefor" and "surplus" funds and not threaten AAMC's ability to continue as a going concern, AAMC's Board of Directors retains its fiduciary duties to AAMC's common shareholders. AAMC's Board of Directors may not favor the interests of the Series A Shareholders over those of its common shareholders. Rather, AAMC's Board of Directors has a duty to prefer the common shareholders' interests, as pure equity holders, over the interests of the Series A Shareholders.

### E.    There Is a Dispute Between AAMC and Defendants Regarding Whether AAMC Must Redeem Defendants' Series A Shares

70.     Defendants have informed AAMC that they believe they have the right to require AAMC to redeem all of Defendants' Series A Shares on the first Early Redemption Date, March 15, 2020. Defendants have further informed AAMC that they reserve all of their options to obtain that result.

71.     AAMC does not intend to redeem Defendants' Series A Shares because it does not have the legally available funds to do so and, as stated above, without such funds, it has no obligation to redeem the Series A Shares under § 5(b) of the Certificate. AAMC also does not intend to redeem a portion of Defendants' Series A Shares because AAMC has no obligation under the Certificate to redeem less than all of Defendants' Series A Shares. The parties thus have

reached an impasse that, unless resolved, puts a cloud over AAMC and its ability to use the legally available funds it does have for the best interests of the company and all of its shareholders.

72. This Court should remove this cloud and resolve this dispute by declaring that § 5(b) of the Certificate only obligates AAMC to redeem any of a Shareholder's Series A Shares, if it has sufficient funds "legally available" to redeem "all, but not less than all," of the Shareholder's Series A Shares.

73. This Court also should declare that because AAMC does not have sufficient "legally available" funds to redeem "all, but not less than all," of Defendants' Series A Shares on the first Early Redemption Date, March 15, 2020, AAMC has no obligation to redeem any of Defendants' Series A Shares on such date.

## CAUSE OF ACTION

## COUNT I – DECLARATORY JUDGMENT

### (Against All Defendants)

74. AAMC incorporates each of the foregoing allegations as fully set forth herein.

75. A controversy exists between AAMC and Defendants regarding AAMC's obligations under § 5(b) of the Certificate.

76. AAMC seeks a declaration that, under § 5(b) of the Certificate, for AAMC to be obliged to redeem any of a Shareholder's Series A Shares, AAMC must have sufficient funds "legally available" to redeem "all, but not less than all," of the Shareholder's Series A Shares. (*See* Exhibit A, Certificate, § 5(b).)

77. AAMC further seeks a declaration that, because AAMC does not have sufficient "legally available" funds to redeem "all, but not less than all," of Defendants' Series A Shares on

the first Early Redemption Date, March 15, 2020, AAMC has no obligation to redeem any of Defendants' Series A Shares on such date.

## PRAYER FOR RELIEF

WHEREFORE, AAMC respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(i)      declaring that under § 5(b) of the Certificate, for AAMC to be obliged to redeem any of a Shareholder's Series A Shares, AAMC must have sufficient funds "legally available" to redeem "all, but not less than all," of the Shareholder's Series A Shares;

(ii)     declaring that under § 5(b) of the Certificate, because AAMC does not have sufficient "legally available" funds to redeem "all, but not less than all," of Defendants' Series A Shares on the first Early Redemption Date, March 15, 2020, AAMC has no obligation to redeem any of Defendants' Series A Shares on such date;

(iii)    awarding all legal fees and costs, including attorneys' fees, incurred by AAMC in connection with this adversary proceeding; and

(iv)     awarding any other and further relief as the Court deems just and equitable.

Dated:  January 27, 2020
Christiansted, St. Croix, United States Virgin Islands

Respectfully submitted,

/s/

Joel H. Holt (V.I. Bar #6)
JOEL H. HOLT. ESQ. P.C.
2132 Company Street
Christiansted, St. Croix, United States Virgin Islands  00820
Tel:  (340) 773-8709
Fax:  (340) 773-8677
holtvi@aol.com

*Counsel for Plaintiff AAMC*

# EXHIBIT A

Exhibit 3.1

ALTISOURCE ASSET MANAGEMENT CORPORATION

CERTIFICATE OF DESIGNATIONS

Pursuant to Sections 91-97 of the General

Corporation Law of the U.S. Virgin Islands

Series A Convertible Preferred Stock

(Par Value $0.01 Per Share)

Altisource Asset Management Corporation (the "*Corporation*"), a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the U.S. Virgin Islands (the "*General Corporation Law*"), hereby certifies that, pursuant to the authority expressly granted to and vested in the Board of Directors of the Corporation (the "*Board of Directors*") by the Amended and Restated Articles of Incorporation of the Corporation filed with the Office of the Lieutenant Governor, Division of Corporations and Trademarks, on December 4, 2012 (as amended from time to time, the "*Articles of Incorporation*") which authorizes the issuance, by the Corporation, in one or more series of up to 1,000,000 shares of preferred stock, par value $0.01 per share (the "*Preferred Stock*"), and in accordance with the provisions of Sections 91-97 of the General Corporation Law, the Board of Directors on March 12, 2014 duly adopted the following resolutions:

RESOLVED, that the undersigned hereby approve issuance of up to 250,000 shares of Preferred Stock having the rights, restrictions, privileges and preferences as set forth in the Certificate of Designations; and

FURTHER RESOLVED, that the Board of Directors and Officers of the Corporation be, and each of them hereby is, authorized and directed, in the name and on behalf of the Corporation, to issue said Preferred Stock in accordance with the Certificate of Designations, and to take any and all action appropriate or advisable in order to carry out the purpose and intent of the foregoing resolutions and to effectuate the transactions authorized hereby;

The powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the Preferred are hereby fixed in this Certificate of Designations as follows (certain terms used herein being defined in <u>Section 2</u> hereof):

1.      General.

(a) The shares of such series shall be designated the Series A Convertible Preferred Stock, par value $0.01 per share (the "*Series A Preferred Shares*").

(b) Each Series A Preferred Share shall be identical in all respects with the other Series A Preferred Shares.

(c) The number of Series A Preferred Shares shall initially be 250,000. Series A Preferred Shares that have been issued and reacquired in any manner by the Corporation, including in connection with a conversion into Common Shares, shall be cancelled and shall revert to authorized but unissued Preferred Stock, undesignated as to class or series.

(d) No fractional Series A Preferred Shares shall be issued.

2. Certain Definitions. As used herein, the following terms shall have the following meanings:

"*19.9% Share Cap*" shall have the meaning set forth in <u>Section 7(b)</u>.

"*Additional Shares*" shall have the meaning set forth in <u>Section 6(e)</u>.

"*Adjustment Price*" shall have the meaning set forth in Section 6(e).

"*Articles of Incorporation*" shall have the meaning set forth in the introductory paragraph of this Certificate of Designations.

"*Board of Directors*" shall have the meaning set forth in the introductory paragraph of this Certificate of Designations.

"*Business Day*" shall mean any day other than Saturday, Sunday or a day on which state or federally chartered banking institutions in New York, New York are not required to be open.

"*Change in Control*" shall mean:

(x)    any consolidation or merger of the Corporation other than any such consolidation or merger that results in the holders of all classes of the Corporation's voting equity securities immediately prior to such transaction owning, directly or indirectly, as a result of such merger or consolidation, more than 50% of the surviving corporation or transferee or the parent thereof immediately after such event; or

(y)    any sale or transfer of all or substantially all of the assets of the Corporation and its subsidiaries, on a consolidated basis, to another person that is not an affiliate of the Corporation;

*provided that* any such transaction described in clause (x) or (y) effected solely to change the Corporation's jurisdiction of incorporation or to form a holding company for the Corporation and that results in a share exchange or reclassification or similar exchange of the outstanding Common Shares solely into common shares of the surviving entity shall not constitute a "Change in Control."

"*Code*" shall mean the U.S. Internal Revenue Code of 1986, as amended (or any successor statute) and as applicable to the U.S. Virgin Islands pursuant to the Naval Services Appropriation Act of July 12, 1921, 48 U.S.C. § 1397.

"*Common Shares*" shall mean the shares of Common Stock, par value $0.01 per share, of the Corporation, subject to the provisions of Section 6(f).

"*Common Share Events*" shall have the meaning set forth in Section 6(e)(i).

"*Constituent Person*" shall have the meaning set forth in Section 6(f).

"*Continuation Right*" shall have the meaning set forth in Section 4(b).

"*Conversion Price*" shall mean $1,250 as such amount may be adjusted pursuant to Section 6 hereof.

"*Corporation*" shall have the meaning set forth in the introductory paragraph of this Certificate of Designations.

"*Corporation Redemption Date*" shall have the meaning set forth in Section 5(a).

"*Corporation Redemption Notice*" shall have the meaning set forth in Section 5(a).

"*Current Market Price*" shall mean, with respect to the Common Shares, on any date specified herein, the average of the Market Price during the period of the most recent ten (10) consecutive Trading Days ending on such date.

"*Exchange Act*" means the Securities Exchange Act of 1934, and any statute successor thereto, in each case as amended from time to time.

"*General Corporation Law*" shall have the meaning set forth in the introductory paragraph of this Certificate of Designations.

"*holder*" of Series A Preferred Shares shall mean the stockholder in whose name such Series A Preferred Shares are registered in the stock books of the Corporation.

"*Holder Conversion Election Date*" shall have the meaning set forth in Section 6(b)(i).

*"Holder Conversion Election Notice"* shall have the meaning set forth in Section 6(b)(i).

*"Holder Redemption Date"* shall have the meaning set forth in Section 5(b).

*"Holder Redemption Notice"* shall have the meaning set forth in Section 5(b).

*"Issue Date"* shall mean the first date on which any Series A Preferred Shares are issued and sold.

*"Junior Shares"* shall have the meaning set forth in Section 9(b).

*"Liquidation"* shall mean (A) a dissolution or winding up of the Corporation, whether voluntary or involuntary, or (B) a Change in Control.

*"Liquidation Preference"* shall have the meaning set forth in Section 4(a).

*"Mandatory Redemption Date"* shall mean March 15, 2044.

*"Market Price"* shall mean, with respect to the Common Shares on any date, the last reported sales price, regular way on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way on such day, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the NYSE MKT or, if the Common Shares are not listed or admitted for trading on NYSE MKT, as reported in the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the Common Shares are listed or admitted for trading or, if the Common Shares are not listed or admitted for trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the principal automated quotation system that may then be in use or, if the Common Shares are not quoted by any such system, the average of the closing bid and asked prices as furnished by a professional market maker regularly making a market in the Common Shares selected for such purpose by the Board of Directors, if there is no such professional market maker, such amount as an independent investment banking firm selected by the Board of Directors determines to be the value of a Common Share.

*"Merger Liquidation"* shall have the meaning set forth in Section 4(b).

*"NYSE MKT"* shall mean the NYSE MKT LLC.

*"Non-Electing Share"* shall have the meaning set forth in Section 6(f).

*"Optional Conversion"* shall have the meaning set forth in Section 6(a)(i).

*"Optional Conversion Right"* shall have the meaning set forth in Section 6(a)(i).

*"Parity Shares"* shall have the meaning set forth in Section 9(a).

*"Person"* shall mean any individual, firm, partnership, corporation, limited liability company or other entity, and shall include any successor (by merger or otherwise) of such entity.

*"Preferred Stock"* shall have the meaning set forth in the introductory paragraph of this Certificate of Designations.

*"Purchase Agreement"* means that certain Purchase Agreement, dated March 13, 2014 to be entered into between the Corporation, and certain holders, pursuant to which Series A Preferred Shares will be sold to such holders.

*"Redemption Date"* shall mean March 15, 2020 and each successive five year anniversary of March 15, 2020.

*"Redemption Price"* shall mean the product of (a) the number of Series A Preferred Shares held by a holder of Series A Preferred Shares and (b) the Liquidation Preference.

*"SEC"* shall mean the U.S. Securities and Exchange Commission.

*"Securities"* shall have the meaning set forth in Section 6(e)(iii).

"*Series A Preferred Shares*" shall have the meaning set forth in Section 1.

"*set apart for payment*" shall be deemed to include, without any action other than the following, the recording by the Corporation in its accounting ledgers of any accounting or bookkeeping entry which indicates, pursuant to a declaration of a dividend or other distribution by the Board of Directors, the allocation of funds to be so paid on any series or class of shares of capital stock of the Corporation; *provided, however*, that if any funds for any class or series of Junior Shares or any class or series of Parity Shares are placed in a separate account of the Corporation or delivered to a disbursing, paying or other similar agent, then "set apart for payment" with respect to the Series A Preferred Shares shall mean placing such funds in a separate account or delivering such funds to a disbursing, paying or other similar agent.

"*Shares*" shall mean the total number of shares of stock that the Corporation shall have authority to issue pursuant to Article IV of the Articles of Incorporation.

"*Spin-Off*" shall have the meaning set forth in Section 6(e)(iii).

"*Stock Price*" shall mean, with respect to any Liquidation, the Current Market Price of the Common Shares on the Trading Day preceding the date on which such Liquidation occurs or becomes effective.

"*Trading Day*" shall mean any day on which the securities in question are traded on the NYSE MKT or, if such securities are not listed or admitted for trading on the NYSE MKT , on the principal national securities exchange on which such securities are listed or admitted for trading.

"*Trading Market*" shall mean whichever of the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market or OTC Bulletin Board on which the Common Shares are listed or quoted for trading on the date in question.

"*Transaction*" shall have the meaning set forth in Section 6(f).

"*Valuation Period*" shall have the meaning set forth in Section 6(e)(iii).

3. Dividends.

The holders of Series A Preferred Shares shall have no right to receive dividends thereon.

4.      Liquidation Preference.

(a) In the event of any Liquidation (other than a Liquidation arising as a result of the occurrence of a Change in Control pursuant to which a holder shall have exercised its Continuation Right as set forth in Section 4(b)), before any payment or distribution of the assets of the Corporation (whether capital or surplus) shall be made to or set apart for payment to the holders of Junior Shares, the holders of Series A Preferred Shares shall be entitled to receive an amount in cash equal to the greater of:

(i)     $1,000 per Series A Preferred Share (the "*Liquidation Preference*") plus the aggregate amount of cash that such holder would have received had it owned a number of Common Shares equal to the Liquidation Preference per Series A Preferred Share divided by the Conversion Price in effect on each ex-dividend date with respect to the payment of cash dividends (exclusive of any adjustments to such Conversion Price pursuant to Section 6(e)(iv) hereof) from the Issue Date through such Liquidation; and

(ii)    an amount per Series A Preferred Share equal to

(x)     the number of Common Shares of the Corporation issuable upon conversion of such Series A Preferred Share at the Conversion Price in effect immediately prior to such Liquidation

- *multiplied by -*

(y)     the Stock Price for such Liquidation.

Until the holders of the Series A Preferred Shares have been paid the amount specified in the first sentence of this *Section 4(a)* in full, no payment will be made to any holder of Junior Shares upon Liquidation. If, upon any such Liquidation, the assets of the Corporation, or proceeds thereof, distributable among the holders of Series A Preferred Shares shall be insufficient to pay in full the preferential amount aforesaid and liquidating payments on any other shares of any class or series of Parity Shares, then such assets, or the proceeds thereof, shall be distributed among the holders of such Series A Preferred Shares and such other Parity Shares ratably in accordance with the amounts that would be payable on such Series A Preferred Shares and such other Parity Shares if all amounts payable thereon were paid in full.

(b) In connection with a Merger Liquidation (as defined below), each holder of Series A Preferred Shares shall have the right (a "*Continuation Right*") to elect, by delivering written notice to the Corporation not less than ten (10) Business Days prior to the Merger Liquidation, to require the Corporation to make provision for the Series A Preferred Shares to be assumed by the surviving entity as described in *Section 6(f)*; *provided, however*, notwithstanding the election by any of the holders of the Series A Preferred Shares of the Continuation Right, the Corporation shall have the right, in connection with any Merger Liquidation, to elect, by delivering written notice to the holders of Series A Preferred Shares at any time prior to the Merger Liquidation, to redeem any or all of the outstanding Series A Preferred Shares for an amount per Series A Preferred Share equal to the amount specified in *Section 4(a)*. A "*Merger Liquidation*" shall be a Liquidation occurring as a result of a Change in Control described in clause (x) of the definition of the term Change in Control (after giving effect to any exceptions to or exclusions from such definition) that also constitutes a Transaction within the meaning of Section 6(f) hereof.

Upon a merger or consolidation of the Corporation with one or more entities that are affiliates of the Corporation, the Corporation shall make provision for the Series A Preferred Shares to be assumed by the surviving entity as described in *Section 6(f)*.

(c) Notice of any Liquidation shall be given by mail, postage prepaid, not less than 30 days prior to the distribution or payment date stated therein, to each holder of record of Series A Preferred Shares appearing on the stock books of the Corporation as of the date of such notice at the address of said holder shown therein. Such notice shall state a distribution or payment date, the amount to be paid pursuant to *Section 4(a)* and the place where the such amount shall be distributable or payable.

(d) After the payment in cash to the holders of Series A Preferred Shares of the full amount specified in the *Section 4(a)* with respect to outstanding Series A Preferred Shares, the holders of outstanding Series A Preferred Shares shall have no right or claim, based on their ownership of Series A Preferred Shares, to any of the remaining assets of the Corporation. Subject to the rights of the holders of any Parity Shares, upon any Liquidation of the Corporation, after payment shall have been made in full to the holders of Series A Preferred Shares and any Parity Shares, as provided in this *Section 4*, any other series or class or classes of Junior Shares shall, subject to the respective terms thereof, be entitled to receive any and all assets remaining to be paid or distributed, and the holders of the Series A Preferred Shares and any Parity Shares shall not be entitled to share therein.

5.      Redemption.

(a) The Corporation, at its option, shall have the right to redeem all of the Series A Preferred Shares by providing written notice to each holder within fifteen (15) Business Days (but not more than thirty (30) Business Days) prior to a Redemption Date of its intent to redeem the Series A Preferred Shares on such Redemption Date (each, a "*Corporation Redemption Notice*") which will specify the date set for such redemption, which date shall be no more than thirty (30) days after the Corporation Redemption Notice (the "*Corporation Redemption Date*"). The Corporation shall redeem for cash on the Corporation Redemption Date, out of funds legally available therefor, all, but not less than all, of the outstanding Series A Preferred Shares held by such holder at an amount equal to the Redemption Price.

(b) Each holder, at its option, shall have the right, in its sole discretion, to require the Corporation to redeem all of its outstanding Series A Preferred Shares by providing written notice to the Corporation within fifteen (15) Business Days (but not more than thirty (30) Business Days) prior to a Redemption Date of its intent to cause the Corporation to redeem such holder's Series A Preferred Shares on such Redemption Date (each, a "*Holder Redemption Notice*") which will specify (i) the name of the holder delivering such Holder Redemption Notice and (ii) that such holder is exercising its option, pursuant to this Section 5, to require the Corporation to redeem shares of Series A Preferred Shares held by such holder. The Corporation shall, within fifteen (15) Business Days of receipt of such Holder Redemption Notice, deliver to the holder exercising its rights to require redemption of the Series A Preferred Shares a notice specifying the date set for such redemption, which date shall be no more than thirty (30) Business Days after the Holder Redemption Notice (the "*Holder Redemption Date*"). The Corporation shall redeem for cash on the Holder Redemption Date, out of funds legally available therefor, all, but not less than all, of the outstanding Series A Preferred Shares held by such holder at an amount equal to the Redemption Price.

(c) The Corporation shall redeem for cash on the Mandatory Redemption Date, out of funds legally available therefor, all, but not less than all, of the outstanding Series A Preferred Shares held by all holders at an amount equal to the Redemption Price.

(d) In the case of any redemption pursuant to this Section 5, unless the Corporation defaults in the payment in full of the Redemption Price, all rights of the holders of the shares of Series A Preferred Shares subject to such redemption by reason of their ownership of such shares shall cease on such Redemption Date, except the right to receive the Redemption Price on surrender to the Corporation of the certificates representing such Series A Preferred Shares. After the applicable Redemption Date, the Series A Preferred Shares shall not be deemed to be outstanding and shall not be transferable on the books of the Corporation, except to the Corporation.

(e) Any Series A Preferred Shares redeemed by the Corporation pursuant to this Section 5 shall be canceled and shall have the status of authorized and unissued preferred stock, without designation as to series.

6.       Conversion.

(a) Subject to the terms and conditions contained in this Section 6, the Series A Preferred Shares shall be convertible as follows:

(i) from and after the Issue Date, the holders of Series A Preferred Shares shall have the right, at their option (the "*Optional Conversion Right*"), to require the Corporation to convert some or all of their Series A Preferred Shares as set forth in the Holder Conversion Election Notice (as defined below) into the number of fully paid and non-assessable Common Shares obtained by dividing the aggregate Liquidation Preference of such specified Series A Preferred Shares by the Conversion Price then in effect (each an "*Optional Conversion*"); and

(b) Any Optional Conversion shall be subject to the following terms and conditions, as applicable:

(i) In order to exercise the Optional Conversion Right, the holder of Series A Preferred Shares shall send a written notice to the Corporation (the "*Holder Conversion Election Notice*") stating that the holder thereof has elected to convert Series A Preferred Shares (the date of such written notice, the "*Holder Conversion Election Date*"). The Holder Conversion Election Notice shall also state the number of Series A Preferred Shares such holder wishes to convert and the number of Common Shares to be issued by the Corporation to such holder pursuant to the Optional Conversion. The holder of Series A Preferred Shares shall include with the Holder Conversion Election Notice, the certificate or certificates representing the Series A Preferred Shares to be converted duly endorsed or assigned to the Corporation or in blank. As promptly as practicable, but in no event later that fifteen (15) Business Days, following receipt of a Holder Conversion Election Notice and the certificate or certificates representing the Series A Preferred Shares to be converted, the Corporation shall (or cause a transfer agent for the Common Shares to) issue and shall deliver, a certificate or certificates for the number of full Common Shares issuable upon such Optional Conversion, together with payment in lieu of any fraction of a share, as provided in Section 6(d), to the Person or Persons entitled to receive the same. If fewer than all the Series A Preferred Shares represented by a certificate are converted pursuant to a Holder Conversion Election Notice, upon such conversion the Corporation shall (or cause a transfer agent for the Series A Preferred Shares to) also issue and deliver to the holder of Series A Preferred Shares a new certificate representing the Series A Preferred Shares not so converted.

(ii) Unless the Common Shares issuable on an Optional Conversion are to be issued in the same name as the name in which such Series A Preferred Shares are registered, each share surrendered for conversion shall be accompanied by instruments of transfer, in form reasonably satisfactory to the Corporation or to such holder's duly authorized attorney and an amount sufficient to pay any transfer or similar tax (or evidence reasonably satisfactory to the Corporation demonstrating that such taxes have been paid).

(c) Each Optional Conversion shall be deemed to have been effected immediately prior to the close of business on the Holder Conversion Election Date and the Person or Persons in whose name or names any Common Shares shall be issuable upon such conversion shall be deemed to have become the holder or holders of record of the Common Shares represented thereby at such time on such date, and such conversion shall be on such date unless the stock transfer books of the Corporation shall be closed on that date, in which event such Person or Persons shall be deemed to have become such holder or holders of record at the close of business on the next succeeding day on which such stock transfer books are open.

(d) No fractional shares or scrip representing fractions of Common Shares, shall be issued upon conversion of the Series A Preferred Shares. Instead of any fractional interest in a Common Shares, that would otherwise be deliverable upon the conversion of a Series A Preferred Share, the Corporation shall pay to the holder of such Series A Preferred Share an amount

in cash based upon the Current Market Price of Common Shares on the Trading Day immediately preceding the Holder Conversion Election Date. If more than one Series A Preferred Share shall be converted at one time by the same holder, the number of full Common Shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of Series A Preferred Shares so surrendered.

(e) The Conversion Price shall be adjusted from time to time as follows:

(i)  If the Corporation exclusively issues Common Shares as a dividend or distribution on all the Common Shares, or if the Corporation effects a share split or share combination, the Conversion Price will be adjusted based on the following formula:

$$CP_1 = CP_0 \, x \, \frac{OS_0}{OS_1}$$

where,

$CP_0 =$  the Conversion Price in effect immediately prior to the open of business on the ex-dividend date of such dividend or distribution, or immediately prior to the open of business on the effective date of such share split or combination, as applicable;

$CP_1 =$  the Conversion Price in effect immediately after the open of business on such ex-dividend date or effective date;

$OS_0 =$  the number of the Corporation's Common Shares outstanding immediately prior to the open of business on such ex-dividend date or effective date, as applicable, before giving effect to such dividend, distribution, share split or share combination; and

$OS_1 =$  the number of the Corporation's Common Shares outstanding immediately after giving effect to such dividend, distribution, share split or share combination, as applicable.

Any adjustment made under this subparagraph (i) of Section 6(e) shall become effective immediately after the open of business on the ex-dividend date for such dividend or distribution, or immediately after the open of business on the effective date for such share split or share combination. If any dividend or distribution of the type described in this subparagraph (i) of Section 6(e) is declared but not so paid or made, the Conversion Price shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(ii)  If the Corporation issues to all holders of the Common Shares any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the date of such issuance, to subscribe for or purchase Common Shares, at a price per share less than the Current Market Price as of the Trading Day immediately preceding the date of announcement of such issuance, the Conversion Price will be decreased based on the following formula:

$$CP_1 = CP_0 \, x \, \frac{OS_0 + Y}{OS_0 + X}$$

where,

$CP_0 =$  the Conversion Price in effect immediately prior to the open of business on the ex-dividend date for such issuance;

$CP_1 =$  the Conversion Price in effect immediately after the open of business on such ex-dividend date;

$OS_0 =$  the number of Common Shares outstanding immediately prior to the open of business on such ex-dividend date;

$X =$  the total number of Common Shares issuable pursuant to such rights, options or warrants; and

Y =     the number of Common Shares equal to the aggregate price payable to exercise such rights, options or warrants divided by the Current Market Price as of the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants.

Any decrease in the Conversion Price made pursuant to this subparagraph (ii) Section 6(e) will be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the ex-dividend date for such issuance. To the extent that such rights, options or warrants are not exercised prior to their expiration or Common Shares are not delivered upon the expiration of such rights, options or warrants, the Conversion Price shall be readjusted to the Conversion Price that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of shares of Common Shares actually delivered. If such rights, options or warrants are not so issued, or if such rights, options or warrants are not exercised prior to their expiration, the Conversion Price shall be increased to be the Conversion Price that would then be in effect if such ex-dividend date for such issuance had not occurred.

In determining whether any rights, options or warrants entitle the holders of Common Shares to subscribe for or purchase Common Shares at a price per share less than such Current Market Price as of the Trading Day immediately preceding the date of announcement for such issuance, and in determining the aggregate offering price of such Common Shares, there shall be taken into account any consideration received by the Corporation for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

(iii)     If the Corporation distributes shares of its capital stock, evidences of its indebtedness, other assets or property of the Corporation or rights, options or warrants to acquire its capital stock or other securities, to all holders of the Common Shares, excluding:

     (x)     dividends or distributions, rights options or warrants as to which an adjustment was effected pursuant to subparagraphs (i) and (ii) of Section 6(e);

     (y)     dividends or distributions paid exclusively in cash as to which an adjustment was effected pursuant to subparagraph (iv) of Section 6(e); and

     (z)     Spin-Offs as to which the provisions set forth below in this subparagraph (iii) shall apply;

then the Conversion Price shall be decreased based on the following formula:

$$CP_1 = CP_0 \times \frac{SP_0 - FMV}{SP_0}$$

where,

$CP_0 =$     the Conversion Price in effect immediately prior to the open of business on the ex-dividend date for such distribution;

$CR_1 =$     the Conversion Price in effect immediately after the open of business on such ex-dividend date;

$SP_0 -$     the Current Market Price of the Common Shares as of the Trading Day immediately preceding the ex-dividend date for such distribution; and

$FMV =$     the fair market value (as determined by the Board of Directors, or a committee thereof) of the shares of capital stock, evidences of indebtedness, other assets or property of the Corporation or rights, options or warrants to acquire the Corporation's capital stock or other securities distributed with respect to each outstanding Common Share on the ex-dividend date for such distribution.

If "FMV" (as defined above) is equal to or greater than the "$SP_0$" (as defined above), in lieu of the foregoing increase, each holder shall receive, in respect of each Series A Preferred Share it holds, at the same time and upon the same terms as holders of the Common Shares, the amount and kind of the Corporation's capital stock, evidences of the Corporation's indebtedness, other assets or property of the Corporation or rights, options or warrants to acquire the Corporation's capital stock or other securities that such holder would have received as if such holder owned a number of Common Shares equal

to the Liquidation Preference per Series A Preference Share divided by the Conversion Price in effect on the ex-dividend date for the distribution.

Any decrease in the Conversion Price made under the preceding paragraph of this subparagraph (iii) will become effective immediately after the open of business on the ex-dividend date for such distribution. If such distribution is not so paid or made, the Conversion Price shall be increased to be the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

With respect to an adjustment pursuant to this subparagraph (iii) where there has been a payment of a dividend or other distribution on the Common Shares of shares of capital stock of any class or series, or similar equity interest, of or relating to a subsidiary of the Corporation or other business unit of the Corporation, and such capital stock or similar equity interest is listed or quoted (or will be listed or quoted upon the consummation of the distribution) on a United States national securities exchange (a "Spin-Off"), the Conversion Price will be adjusted based on the following formula:

$$CP_1 = CP_0 \, x \quad \frac{MP_0}{FMV_0 + MP_0}$$

where,

$CP_0$ =    the Conversion Price in effect immediately prior to the open of business on the ex-dividend date for such Spin-Off;

$CP_1$ =    the Conversion Price in effect immediately after the open of business on the ex-dividend date for such Spin-Off;

$FMV_0$ =    the average of the last reported sale prices of the capital stock or similar equity interest distributed to holders of Common Shares applicable to one Common Share over the first 10 consecutive Trading Day period after, and including, the effective date of the Spin-Off (the "Valuation Period"); and

$MP_0$ =    the average of the Current Prices of the Common Shares over the Valuation Period.

The adjustment to the applicable Conversion Price under the preceding paragraph of this subparagraph (iii) will be made immediately after the open of business on the day after the last Trading Day of the Valuation Period, but will be given effect as of the open of business on the ex-dividend date for the Spin-Off. For purposes of determining the applicable Conversion Price, in respect of any conversion during the 10 Trading Days commencing on the ex-dividend date for any Spin-Off, references within the portion of this subparagraph (iii) related to "Spin-Offs" to 10 Trading Days shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the ex-dividend date for such Spin-Off to, and including, the relevant date of conversion.

The occurrence of a distribution or the occurrence of any other event as a result of which holders of Series A Preferred Shares shall not be entitled to receive rights, including exchange rights (the "*Rights*"), pursuant to any stockholders protective rights agreement (the "*Agreement*") that may be adopted by the Corporation as if such holders had converted such shares into Common Shares immediately prior to the occurrence of such distribution or event shall not be deemed a distribution of Securities for the purposes of any Conversion Price adjustment pursuant to this subparagraph (iii) or otherwise give rise to any Conversion Price adjustment pursuant to this Section 6; *provided, however,* that in lieu of any adjustment to the Conversion Price as a result of any such a distribution or occurrence, the Corporation shall make provision so that Rights, to the extent issuable at the time of conversion of any Series A Preferred Shares into Common Shares, shall issue and attach to such Common Shares then issued upon conversion in the amount and manner and to the extent and as provided in the Agreement in respect of issuances at the time of Common Shares other than upon conversion.

(iv)    If any cash dividend or distribution is made to all holders of Common Shares, the Conversion Price shall be adjusted based on the following formula:

$$CP_1 = CP_0 \, x \quad \frac{(SP_0 - C)}{SP_0}$$

where,

$CP_0$ = the Conversion Price in effect immediately prior to the open of business on the ex-dividend date for such dividend or distribution;

$CP_1$ = the Conversion Price in effect immediately after the open of business on the ex-dividend date for such dividend or distribution;

$SP_0$ = the Market Price of the Common Shares on the Trading Day immediately preceding the ex-dividend date for such dividend or distribution; and

$C$ = the amount in cash per share that the Corporation distributes to holders of Common Shares.

If "$C$" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing decrease to the Conversion Price, each holder shall receive, for each Series A Preferred Share it holds, at the same time and upon the same terms as holders of Common Shares, the amount of cash that such holder would have received if such holder had owned a number of Common Shares equal to the Liquidation Preference per Series A Preferred Share divided by the Conversion Price in effect on the ex-dividend date for such cash dividend or distribution.

Any decrease in the Conversion Price pursuant to this subparagraph (iv) shall become effective immediately after the open of business on the ex-dividend date for such dividend or distribution. If such dividend or distribution is not so paid, the Conversion Price shall be increased to be the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(v) If, at any time or from time to time after the Issue Date, the Corporation issues or sells any Common Shares (other than in connection with any underwritten public offering and other than issuances to unaffiliated third parties for a business combination on an arm's-length basis) ("*Additional Shares*") for a cash consideration per share that is less than the Current Market Price on the Trading Day immediately preceding the earlier of the issuance or sale, or public announcement of the issuance or sale, of such Additional Shares, then the Conversion Price shall be reduced in accordance with the following formula:

$$CP_1 = CP_0 \times \frac{(OS_0 \times AP) + AC}{(OS_0 + AS) \times AP}$$

where,

$CP_1$ = the Conversion Price in effect at the close of business on the date of such issuance or sale of the Additional Shares;

$CP_0$ = the Conversion Price in effect immediately prior to the close of business on the date of such issuance or sale;

$OS_0$ = the number of Common Shares outstanding immediately prior to such issuance or sale;

$AP$ = the Current Market Price on the Trading Day preceding the earlier of the issuance or sale or public announcement of the issuance or sale of such Additional Shares;

$AC$ = the aggregate cash consideration receivable by the Corporation for the total number of Common Shares so issued or sold; and

$AS$ = the number of Additional Shares issued or sold.

An adjustment made pursuant to this subparagraph (v) shall be made on the next Business Day following the date on which any such issuance or sale is made and shall be effective retroactively to the close of business on the date of such issuance or sale.

(vi) No adjustment in the Conversion Price shall be required unless such adjustment would require a cumulative increase or decrease of at least 1% in such price; *provided, however*, that any adjustments that by reason of this subparagraph (vi) are not required to be made shall be carried forward and taken into account in any subsequent adjustment until made; and provided, further, that any adjustment shall be required and made in accordance with the provisions of this Section

6 (other than this subparagraph (vi)) not later than such time as may be required in order to preserve the tax-free nature of a distribution to the holders of Common Shares.

Notwithstanding any other provisions of this Section 6, the Corporation shall not be required to make any adjustment of the Conversion Price for the issuance of any Common Shares pursuant to any plan providing for the reinvestment of dividends or interest payable on securities of the Corporation and the investment of additional optional amounts in Common Shares under such plan.

All calculations under this Section 6 shall be made to the nearest cent (with $.005 being rounded upward) or to the nearest one-tenth of a share (with .05 of a share being rounded upward), as the case may be.

Anything in this paragraph (e) to the contrary notwithstanding, the Corporation shall be entitled, to the extent permitted by law, to make such reductions in the Conversion Price, in addition to those required by this paragraph (e), as it in its discretion shall determine to be advisable in order that any stock dividends, subdivision of shares, reclassification or combination of shares, distribution of rights, options or warrants to purchase stock or securities, or a distribution of other assets (other than cash dividends) hereafter made by the Corporation to its stockholders shall not be taxable.

(f) If the Corporation becomes party to any transaction (including without limitation a merger, consolidation, statutory share exchange, self-tender offer for all or substantially all Common Shares outstanding, sale of all or substantially all of the Corporation's assets or recapitalization of the Common Shares but excluding any Common Share Events (each of the foregoing being referred to herein as a "*Transaction*"), in each case as a result of which Common Shares shall be converted into the right to receive stock, securities or other property (including cash or any combination thereof), each Series A Preferred Share that is not redeemed or converted into the right to receive stock, securities or other property in connection with such Transaction shall thereafter be convertible into the kind and amount of shares of stock, securities and other property (including cash or any combination thereof) receivable upon the consummation of such Transaction by a holder of that number of Common Shares into which one Series A Preferred Share was convertible immediately prior to such Transaction, assuming such holder of Common Shares (i) is not a Person with which the Corporation consolidated or into which the Corporation merged or which merged into the Corporation or to which such sale or transfer was made, as the case may be (a "*Constituent Person*"), or an affiliate of a Constituent Person and (ii) failed to exercise his or her rights of the election, if any, as to the kind or amount of stock, securities and other property (including cash) receivable upon such Transaction (provided that if the kind or amount of stock, securities and other property (including cash) receivable upon such Transaction is not the same for each Common Share held immediately prior to such Transaction by other than a Constituent Person or an affiliate thereof and in respect of which such rights of election shall not have been exercised ("*Non-Electing Share*"), then for the purpose of this paragraph (f) the kind and amount of stock, securities and other property (including cash) receivable upon such Transaction by each Non-Electing Share shall be deemed to be the kind and amount so receivable per share by a plurality of the Non-Electing Shares).

The Corporation shall not be a party to any Transaction unless the terms of such Transaction are consistent with the provisions of this paragraph (f), and it shall not consent or agree to the occurrence of any Transaction until the Corporation has entered into an agreement with the successor or purchasing entity, as the case may be, for the benefit of the holders of the Series A Preferred Shares that will contain provisions enabling the holders of the Series A Preferred Shares that remain outstanding after such Transaction to convert their Series A Preferred Shares into the consideration received by holders of Common Shares at the Conversion Price in effect immediately prior to such Transaction. The provisions of this paragraph (f) shall similarly apply to successive Transactions.

(g) If:

(i) the Corporation declares a dividend (or any other distribution) on the Common Shares (other than in cash out of assets, based on a fair valuation of assets, in excess of the sum of the liabilities of the Corporation and the amount of stated capital attributable to Common Shares, determined on the basis of the most recent annual consolidated cost basis and current value basis and quarterly consolidated balance sheets of the Corporation and its consolidated subsidiaries available at the time of the declaration of the dividend or distribution); or

(ii) the Corporation grants to the holders of the Common Shares of rights or warrants to subscribe for or purchase any shares of any class or any other rights or warrants (other than Rights to which the last paragraph of subparagraph (e)(iii) of this Section 6 applies); or

(iii) there shall occur any reclassification of the Common Shares (other than an event to which subparagraph (e)(i) of this Section 6 applies) or any consolidation or merger to which the Corporation is a party and for which approval of any stockholders of the Corporation is required, or a statutory share exchange involving the conversion or exchange

of Common Shares into securities or other property, or a self-tender offer by the Corporation for all or substantially all of its outstanding Common Shares, or the sale or transfer of all or substantially all of the assets of the Corporation as an entirety and for which approval of any stockholders of the Corporation is required; or

(iv) there shall occur the voluntary or involuntary liquidation, dissolution or winding up of the Corporation,

then the Corporation shall cause to be prepared and delivered to the holders of the Series A Preferred Shares at their addresses as shown on the stock records of the Corporation, as promptly as possible, but at least 15 days prior to the applicable date hereinafter specified, a notice stating (A) the date on which a record is to be taken for the purpose of such dividend, distribution or rights or warrants, or, if a record is not to be taken, the date as of which the holders of Common Shares of record to be entitled to such dividend, distribution or rights or warrants are to be determined or (B) the date on which such reclassification, consolidation, merger, statutory share exchange, self-tender offer, sale, transfer, liquidation, dissolution or winding up is expected to become effective, and the date as of which it is expected that holders of Common Shares of record shall be entitled to exchange their Common Shares for securities or other property, if any, deliverable upon such reclassification, consolidation, merger, statutory share exchange, self-tender offer, sale, transfer, liquidation, dissolution or winding up. Failure to give or receive such notice or any defect therein shall not affect the legality or validity of the proceedings described in this Section 6.

(h) Whenever the Conversion Price is adjusted as herein provided, the Corporation shall promptly prepare and deliver to the holders of the Series A Preferred Shares a notice of such adjustment of the Conversion Price setting forth the adjusted Conversion Price and the effective date of such adjustment and an officer's certificate setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. The Corporation shall mail such notice and such certificate to the holders of each Series A Preferred Share at such holder's last address as shown on the stock records of the Corporation.

(i) In any case in which paragraph (e) of this Section 6 provides that an adjustment shall become effective on the day next following the record date for an event, the Corporation may defer until the occurrence of such event (A) issuing to the holder of any Series A Preferred Share converted after such record date and before the occurrence of such event the additional Common Shares issuable upon such conversion by reason of the adjustment required by such event over and above the Common Shares issuable upon such conversion before giving effect to such adjustment and (B) paying to such holder any amount of cash in lieu of any fraction pursuant to paragraph (d) of this Section 6.

(j) There shall be no adjustment of the Conversion Price in case of the issuance of any shares of capital stock of the Corporation in a reorganization, acquisition or other similar transaction except as specifically set forth in this Section 6. If any action or transaction would require adjustment of the Conversion Price pursuant to more than one paragraph of this Section 6, only one adjustment shall be made, and such adjustment shall be the amount of adjustment that has the highest absolute value.

(k) If the Corporation takes any action affecting the Common Shares, other than action described in this Section 6, that in the opinion of the Board of Directors would materially adversely affect the conversion rights of the holders of the Series A Preferred Shares, the Conversion Price for the Series A Preferred Shares may be adjusted, to the extent permitted by law, in such manner, if any, and at such time, as the Board of Directors, in its sole discretion, may determine to be equitable in the circumstances.

(l) The Corporation will at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued Common Shares, for the purpose of effecting conversion of the Series A Preferred Shares, the full number of Common Shares deliverable upon the conversion of all outstanding Series A Preferred Shares not theretofore converted. For purposes of this paragraph (l), the number of Common Shares that shall be deliverable upon the conversion of all outstanding shares of Series A Preferred Shares shall be computed as if at the time of computation all such outstanding shares were held by a single holder.

(m) Any Common Shares issued upon conversion of the Series A Preferred Shares shall be validly issued, fully paid and non-assessable. Before taking any action that would cause an adjustment reducing the Conversion Price below the then-par value of the Common Shares deliverable upon conversion of the Series A Preferred Shares, the Corporation shall take any corporate action that, in the opinion of its counsel, may be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable Common Shares at such adjusted Conversion Price. The Corporation shall endeavor to list the Common Shares required to be delivered upon conversion of the Series A Preferred Shares, prior to such delivery, upon each national securities exchange, if any, upon which the outstanding Common Shares are listed at the time of such delivery.

(n) The Corporation shall pay any and all documentary stamp or similar issue or transfer taxes payable in respect of the issue or delivery of Common Shares or other securities or property on conversion of the Series A Preferred Shares pursuant hereto; *provided, however*, that the Corporation shall not be required to pay any tax that may be payable in respect of any transfer involved in the issue or delivery of any Common Shares or other securities or property in a name other than that of the holder of the Series A Preferred Shares to be converted, and no such issue or delivery shall be made unless and until the Person requesting such issue or delivery has paid to the Corporation the amount of any such tax has been established, to the reasonable satisfaction of the Corporation, that such tax has been paid.

7.     Ownership Limits; Exchange Cap

(a) Notwithstanding any other provision contained herein or in the Charter, in no event will any holder of Series A Preferred Shares be allowed to accept an aggregate number of Common Shares (taking into account Common Shares obtained upon conversion of the Series A Preferred Shares or otherwise) that, when taken together with the Common Shares of the Corporation beneficially owned by such holder and any affiliates of such holder, collectively exceeds 9.9% of the Common Shares of the Corporation outstanding on the Trading Day immediately preceding the Holder Conversion Election Date (as appropriately adjusted for share splits, share dividends, combinations, recapitalizations and the like). Each holder of Series A Preferred Shares, on one hand, and the Corporation, on the other hand, agree that this provision is for the benefit of the holder of Series A Preferred Shares and may be waived by such holder of Series A Preferred Shares on 65 days' notice to the Corporation.

(b) In no event will the aggregate number Common Shares issued pursuant to the Purchase Agreement and upon conversion of the Series A Preferred Shares issued pursuant to the Purchase Agreement exceed 19.9% of the number of Common Shares outstanding on the Trading Day immediately preceding the date of the Purchase Agreement (as appropriately adjusted for share splits, share dividends, combinations, recapitalizations and the like) (the "*19.9% Share Cap*"), unless the issuance of Common Shares in excess of the 19.9% Share Cap is duly approved in advance by the holders of Common Shares in accordance with Section 713 of the NYSE MKT Rules.

8.     Voting.

(a) Except as otherwise set forth herein or otherwise required by applicable law, the Series A Preferred Shares shall not have any voting rights and powers, and the consent of the holders thereof shall not be required for the taking of any corporate action.

(b) So long as any Series A Preferred Shares are outstanding, in addition to any other vote or consent of stockholders required by the Articles of Incorporation, the affirmative vote of at least a majority of the votes entitled to be cast by the holders of Series A Preferred Shares, and at the time outstanding, voting as a single class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating any amendment, alteration or repeal of any of the provisions of the Articles of Incorporation, including the terms of the Series A Preferred Shares, that materially and adversely affects the voting powers, rights or preferences of the Series A Preferred Shares.

(c) For purposes of this Section 8, each Series A Preferred Share shall have one (1) vote per share.

9.     Rank.

Any class or series of shares of capital stock of the Corporation shall been deemed to rank:

(a) on a parity with the Series A Preferred Shares as to the distribution of assets upon liquidation, dissolution or winding up, whether or not the liquidation preferences per share thereof be different from those of the Series A Preferred Shares, if the holders of such class or series and the Series A Preferred Shares shall be entitled to the receipt of amounts distributable upon liquidation, dissolution or winding up in proportion to their respective liquidation preferences, without preference or priority one over the other ("*Parity Shares*"); and

(b) junior to the Series A Preferred Shares as to the distribution of assets upon liquidation, dissolution or winding up, if such stock or series shall be Common Shares or otherwise expressly designated as ranking junior to the Series A Preferred Shares ("*Junior Shares*").

No class or series of shares of capital stock of the Corporation shall be deemed to rank prior or senior to the Series A Preferred Shares as to distribution of assets upon liquidation, dissolution or winding up.

10.   Record Holders.

  The Corporation and any transfer agent and registrar may deem and treat the record holder of any Series A Preferred Shares as the true and lawful owner thereof for all purposes, and the Corporation and any transfer agent and registrar shall not be affected by any notice to the contrary.

11.   Reports to Holders.

  So long as any Series A Preferred Shares remain outstanding, if the Corporation is not required to file information, documents or reports pursuant to either of Section 13 or Section 15(d) of the Exchange Act, the Corporation shall cause quarterly unaudited financial statements for the first three quarters of each fiscal year and audited financial statements and an opinion thereon by the Corporation's independent certified public accountants to be mailed to each holder of record of Series A Preferred Shares appearing on the stock books of the Corporation as of the date of such mailing at the address of said holder shown therein within 45 or 75 days after the end of the applicable quarterly or annual period, respectively.

12.   No Preemptive Rights.

  No holder of Series A Preferred Shares shall be entitled to any preemptive rights to subscribe for or acquire any unissued shares of capital stock of the Corporation (whether now or hereafter authorized) or securities of the Corporation convertible into, or carrying a right to subscribe to or acquire, any such shares.

13.   No Other Rights.

  The Series A Preferred Shares shall not have any powers, designations, preferences or relative, participating, optional, or other special rights, nor shall there be any qualifications, limitations or restrictions or any powers, designations, preferences or rights of such shares, other than as set forth herein or in the Articles of Incorporation or as may be provided by law.

  *[Remainder of this Page Intentionally Left Blank]*IN WITNESS WHEREOF, Altisource Asset Management Corporation has caused this Certificate to be duly executed in its name and on its behalf by its Chief Executive Officer this 17th day of March, 2014.

Altisource Asset Management Corporation

By: /s/ Ashish Pandey
  Name: Ashish Pandey
  Title: Chief Executive Officer

# EXHIBIT B

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K
## CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): January 13, 2020 (January 13, 2020)

### ALTISOURCE ASSET MANAGEMENT CORPORATION
(Exact name of Registrant as specified in its charter)

| United States Virgin Islands | 001-36063 | 66-0783125 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

5100 Tamarind Reef
Christiansted, United States Virgin Islands 00820
(Address of principal executive offices including zip code)

(340) 692-0525
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter):

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | AAMC | NYSE American |

Item 5.02     **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

<u>Appointment of Co-Chief Executive Officer and Director</u>

On January 13, 2020 (the "Effective Date"), Altisource Asset Management Corporation (the "Company" or "AAMC") appointed Indroneel Chatterjee as the Company's Co-Chief Executive Officer, effective on such date. Mr. Chatterjee also became a member of the Company's Board of Directors on the Effective Date.

The current Chief Executive Officer, George Ellison, will continue as co-Chief Executive Officer and Chairman and be responsible for managing the Company's existing business including the asset management agreement with Front Yard Residential Corporation. Mr. Chatterjee was hired as an additional resource for AAMC and will be responsible for implementing new business.

Mr. Chatterjee, age 39, has served as a consultant to various businesses since March 2019. He previously served as Senior Vice President, New Business Initiatives of Altisource Solutions, Inc. from September 2018 to March 2019. Altisource Solutions, Inc. is a subsidiary of Altisource Portfolio Solutions S.A. (NASDAQ: ASPS) ("ASPS"), an integrated service provider and marketplace for the real estate and mortgage industries. Mr. Chatterjee served as Chief Financial Officer of ASPS from October 2017 to August 2018. Prior to joining ASPS, he served as Head of Credit Solutions, Global Markets at Nomura Securities, an investment banking firm, from January 2017 to September 2017 and as Executive Director on the fixed income trading desk at Nomura from August 2014. Mr. Chatterjee also held the positions of Investment Analyst, Absolute Return Income Fund for Perry Capital from March 2013 to April 2014, Executive Director for UBS Securities LLC from November 2009 to March 2013 and Vice President, High Yield Research for AIG Global Investment Group from October 2006 to November 2009. He holds a Bachelor of Science in Economics from the Wharton School of Business at the University of Pennsylvania.

<u>Executive Compensation</u>

On the Effective Date, the Company and Mr. Chatterjee entered into an Employment Agreement (the "Employment Agreement") setting forth the terms of his employment.

Mr. Chatterjee is entitled to receive an initial annual base salary of $675,000, subject to annual adjustment by the Compensation Committee of the Company's Board of Directors (the "Compensation Committee"), with reduction in salary below such amount only permitted if part of an across-the-board reduction not to exceed 10% of the salaries of all executive officers at the "chief" level.

Mr. Chatterjee will be eligible to earn annual cash bonuses beginning with the fiscal year ending December 31, 2020. His target bonus for 2020 will be $800,000, with a maximum bonus potential for 2020 of $1.6 million. The bonus will be subject to the achievement of performance targets established by the Compensation Committee. He will also receive a cash signing bonus of $800,000, subject to an obligation to repay 100% of such signing bonus if terminated by the Company for Cause (as defined in the Employment Agreement) or without Good Reason (as defined in the Employment Agreement) within the first year following the Effective Date or 50% of such signing bonus if terminated by the Company for Cause or without Good Reason during the second year following the Effective Date.

Mr. Chatterjee will also receive an initial equity award, which award will be made outside of the Company's 2012 Equity Incentive Plan (the "Plan") but will otherwise be subject to the terms and conditions of the Plan. Such initial equity award will be an "inducement award" for purposes of the NYSE American's exemption from shareholder approval requirements for inducement awards. The equity award will consist of options to purchase 60,000 shares of common stock and 60,000 restricted shares. The options will be subject to vesting following the achievement of certain trading price targets and further time-based vesting criteria thereafter. The restricted shares will vest annually over a four-year period following the date of grant.

Mr. Chatterjee will be entitled to receive additional option awards in connection with certain dilutive issuances of securities and will receive relocation expenses and reimbursement of legal fees in connection with the negotiation of the Employment Agreement. He will be eligible to participate in the Company's health, life insurance, disability, retirement and other welfare plans on the same terms available to other senior executives.

Upon termination of employment, Mr. Chatterjee will be eligible to receive accrued salary and benefits payable through the date of termination. He will be subject to customary confidentiality and non-disparagement obligations, as well as a twelve-month obligation not to solicit clients, customers or employees. In addition, if his employment is terminated by the Company

for Cause or by Mr. Chatterjee without Good Reason, he will be subject to a twelve-month non-competition obligation. If his employment is terminated by the Company without Cause or by Mr. Chatterjee for Good Reason, Mr. Chatterjee will be entitled to receive severance equal to the sum of his annual base salary and annual target bonus, payable in twelve month installments, and accelerated vesting of his equity awards (except as prohibited by the Plan), in each case, subject to his execution of a customary release, providing, among other things, confirmation of his confidentiality, non-disparagement and non-solicitation obligations.

Board Service

Mr. Chatterjee will not receive any additional compensation for his service on the Company's Board of Directors.

Other

There are no arrangements or understandings between Mr. Chatterjee and any other person pursuant to which he was selected as an officer or Director of the Company. There are no family relationships between Mr. Chatterjee and any director or executive officer of the Company nor is Mr. Chatterjee party to any related person transactions, in each case as required to be disclosed under Item 401 or 404 of Regulation S-K.

Item 5.03       Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.

Effective on January 13, 2020, the Board of Directors of the Company approved the amendment and restatement of the Company's Second Amended and Restated Bylaws (as amended and restated, such bylaws are the Company's Third Amended and Restated Bylaws) to increase the size of the Board of Directors from four to five and permit the appointment of more than one Chief Executive Officer.

Item 8.01       Other Events.

On January 13, 2020, the Company issued a press release announcing the hiring of Mr. Chatterjee and the terms of his inducement equity award. A copy of the press release is attached as Exhibit 99.1 and incorporated by reference herein.

Item 9.01       Financial Statements and Exhibits.

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 3.1 | Third Amended and Restated Bylaws (marked to show changes from the Second Amended and Restated Bylaws). |
| 99.1 | Press Release of Altisource Asset Management Corporation dated January 13, 2020. |

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Altisource Asset Management Corporation

January 13, 2020                                    By:   /s/ Indroneel Chatterjee

Indroneel Chatterjee
Co-Chief Executive Officer

Exhibit 3.1

THIRDSECOND AMENDED AND RESTATED BYLAWS
OF
ALTISOURCE ASSET MANAGEMENT CORPORATION

### ARTICLE I - OFFICES

The principal office of ALTISOURCE ASSET MANAGEMENT CORPORATION (the "Corporation") in the U.S. Virgin Islands shall be located and maintained in St. Croix, U.S. Virgin Islands, or at such location in the U.S. Virgin Islands as may be changed from time to time at the discretion of the Board of Directors. The Corporation may also maintain an additional office or offices at such other places within the U.S. Virgin Islands as the Board of Directors may from time to time designate.

### ARTICLE II - MEETING OF SHAREHOLDERS

#### Section 1 - Annual Meetings:

Annual meetings of shareholders of the Corporation shall be held on such date as determined by the Board of Directors, and at such time and place as designated in the notice of the meeting, for the purpose of electing Directors and transacting such other business as may properly come before the meeting. A complete list of all shareholders entitled to vote at annual shareholders meetings shall be prepared by the Secretary and made available for inspection at said meetings.

#### Section 2 - Special Meetings:

Special meetings of shareholders may be called at any time by the Board of Directors or by the President, and shall be called by the President or the Secretary at the written request of the holders of a majority of the shares then outstanding and entitled to vote thereat, or as otherwise required under the provisions of Title 13 of the Virgin Islands Code, Sections 1- 453, as they may be from time to time amended.

#### Section 3 - Place of Meetings:

All meetings of shareholders shall be held in the U.S. Virgin Islands at the principal office of the Corporation, or at such other places as shall be designated in the notices or waivers of notice of such meetings and may be held telephonically.

#### Section 4 - Notice of Meetings:

(a)  Except as otherwise provided by Statute, written notice of each meeting of shareholders, whether annual or special, stating the time when and place where it is to be held, shall be served either personally or by mail, not less than ten (10) or more than fifty (50) days before the meeting, upon each shareholder of record entitled to vote at such meeting, or the shareholder's designated agent, and to any other shareholder to whom the giving of notice may be required by law. Notice of a special meeting shall also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If, at any meeting, action is proposed to be taken that would, if taken, entitle shareholders to receive payment for their shares pursuant to the applicable provisions of Virgin Islands Code, the notice of such meeting shall include a statement of that purpose and to that effect. If mailed, such notice shall be directed to each such shareholder at the shareholder's address, as it appears on the records of the shareholders of the Corporation, unless he or she shall have previously filed with the Secretary of the Corporation a written request that notices intended for the shareholder be mailed to the shareholders' agent and/or some other address, in which case, it shall be mailed to the person and address designated in such request.

(b)  Notice of any meeting need not be given to any person who may become a shareholder of record after the mailing of such notice and prior to the meeting, or to any shareholder who attends such meeting in person or by proxy, or to any shareholder who, in person or by proxy, submits a signed waiver of notice either before or after such meeting. Notice of any adjourned meeting of shareholders need not be given, unless otherwise required by statute.

#### Section 5 - Quorum:

Except as otherwise provided herein, or by the applicable provisions of the Virgin Islands Code, or in the Articles of Incorporation (such Articles and any amendments thereof being herein collectively referred to as the "Articles") at all meetings of shareholders of the Corporation, the presence at the commencement of such meetings in person or by proxy of any number

of shareholders holding of record a majority of the total number of shares of the Corporation then issued and outstanding and entitled to vote shall be necessary and sufficient to constitute a quorum for the transaction of any business. The withdrawal of any shareholder after the commencement of a meeting shall have no effect on the existence of a quorum, after a quorum has been established at such meeting.

<u>Section 6 - Voting:</u>

    (a)        Except as otherwise provided by applicable provision of the Virgin Islands Code or by the Articles, any corporate action to be taken by vote of the shareholders shall be authorized by a majority of votes cast at a meeting of shareholders by the holders of shares entitled to vote thereon.

    (b)        Except as otherwise provided by applicable provision of the Virgin Islands Code or by the Articles, at each meeting of shareholders, each holder of record of stock of the Corporation entitled to vote thereat shall be entitled to one vote for each share of stock registered in his or her name on the books of the Corporation.

    (c)        Each shareholder entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provided, however, that the instrument authorizing such proxy to act shall have been executed in writing by the shareholder or the shareholder's attorney in fact thereunto duly authorized in writing. No proxy shall be valid after expiration of eleven (11) months from the date of its execution, unless the person executing same directs in said proxy that it shall continue in force for a longer period of time. Such instrument shall be exhibited to the Secretary at the meeting and shall be filed with the records of the Corporation.

    (d)        Shares registered in the name of another corporation, if entitled to be voted, may be voted by the President or a proxy appointed by the President of such other corporation, unless some other person has been appointed to vote such shares pursuant to a by-law or a resolution of the board of directors of such other corporation, in which case such person may vote such shares. Any fiduciary may vote shares registered in the name of such corporation as such fiduciary, either in person or by proxy.

    (e)        Any resolution in writing, signed by all the shareholders entitled to vote thereon, shall be and constitute action by such shareholders to the effect therein expressed, with the same force and effect as if the same had been duly passed by unanimous vote at a duly called meeting of shareholders of such resolution so signed and shall be inserted in the Minute Book of the Corporation under its proper date.

## ARTICLE III - BOARD OF DIRECTORS

<u>Section 1 - Number, Qualification, Election and Term of Office:</u>

    (a)        The number of Directors of the Corporation shall be ~~four~~ five (~~4~~5) unless and until otherwise determined by vote of a majority of the entire Board of Directors, but shall not be less than three (3). Notwithstanding the foregoing, at all times in which the Corporation has fewer than three (3) shareholders, the number of Directors may be equal to, or greater than, the number of shareholders.

    (b)        Except as may otherwise be provided herein or in the Articles, the members of the Board of Directors of the Corporation, who need not be shareholders, shall be elected by a majority of the votes cast at a meeting of shareholders, by the holders of shares, present in person or by proxy, entitled to vote in the election.

    (c)        Each Director shall hold office until the annual meeting of shareholders next succeeding his or her election, and until his or her successor is elected and qualified, or until his or her prior death, resignation or removal.

<u>Section 2 - Duties and Powers:</u>

The Board of Directors shall be responsible for the control and management of the affairs, property and interests of the Corporation, and may exercise all powers of the Corporation, except as are in the Articles or by applicable provisions of the Virgin Islands Code expressly conferred upon or reserved to the shareholders.

<u>Section 3 - Annual and Regular Meetings; Notices:</u>

    (a)        A regular annual meeting of the Board of Directors shall be held immediately following the annual meeting of shareholders, at a place of such annual meeting of shareholders.

(b)     The Board of Directors may from time to time provide for the holding of other regular meetings of the Board of Directors and may fix the time and place thereof.

(c)     Notice of any regular meeting of the Board of Directors shall not be required to be given and, if given, need not specify the purpose of the meeting; provided, however, that in case the Board of Directors shall fix or change the time or place of any regular meeting, notice of such action shall be given to each Director who shall not have been present at the meeting at which such action was taken within the time limit, and in the manner set forth in paragraph (b), Section 4 of this Article III, with respect to the special meetings, unless such notice shall be waived in the manner set forth in paragraph (c) of such Section 4.

### Section 4 - Special Meetings; Notices:

(a)     Special meetings of the Board of Directors shall be called by the President or by one of the Directors, at such time and place as may be specified in the respective notices or waivers of notice thereof.

(b)     Except as otherwise required by the applicable provisions of the Virgin Islands Code, notice of special meetings shall be mailed directly to each Director, addressed to the Director at his or her residence or usual place of business, at least seven (7) days before the day on which the meeting is to be held, or shall be sent to the Director at such place by facsimile or email, or shall be delivered to him or her personally or given to him or her orally, not later than twenty-four (24) hours before the time at which the meeting is to be held. A notice or waiver of notice need not specify the purpose of the meeting.

(c)     Notice of any special meeting shall not be required to be given to any Director who shall attend such meeting without protesting the lack of notice to the Director prior thereto or at its commencement, or who submits a signed waiver of notice, whether before or after the meeting. Notice of any adjourned meeting shall not be required to be given.

### Section 5 - Chairman:

At all meetings of the Board of Directors, the Chairman of the Board, if any and if present, shall preside. If there shall be no Chairman, or if the Chairman shall be absent, then the President shall preside, and in the President's absence, a Chairman chosen by the Directors shall preside.

### Section 6 - Quorum and Adjournments:

(a)     At all meetings of the Board of Directors the presence of a majority of the entire Board shall be necessary and sufficient to constitute a quorum for the transaction of business, except as otherwise provided by law, by the Articles, or by these Bylaws.

(b)     A majority of the Directors present at the time and place of any regular or special meeting, although less than a quorum, may adjourn the same from time to time without notice, until a quorum shall be present.

### Section 7 - Manner of Acting:

(a)     At all meetings of the Board of Directors, each Director present shall have one vote, irrespective of the number of shares of stock, if any, which the Director may hold.

(b)     Except as otherwise provided by applicable provisions of the Virgin Islands Code, by the Articles, or by these Bylaws, the action of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof, which action is authorized, in writing, by all of the Directors entitled to vote thereon and filed with the Minutes of the proceedings of the Board or the committee shall be the act of the Board of Directors or the committee, as the case may be, with the same force and effect as if the same had been passed by unanimous vote at a duly called meeting of the Board or the committee.

### Section 8 - Vacancies:

Any vacancy in the Board of Directors occurring by reason of any increase in the number of Directors, or by reason of the death, resignation, disqualification, removal (unless a vacancy created by the removal of a Director by the shareholders shall be filled by the shareholders at the meeting at which the removal was effected) or inability to act of any Director, or otherwise,

shall be filled for the unexpired portion of the term by a majority vote of the remaining Directors present, though less than a quorum, at any regular meeting or special meeting of the Board of Directors.

### Section 9 - Resignation:

Any Director may resign at any time by giving written notice to the Board of Directors, the President or the Secretary of the Corporation. Unless otherwise specified in such written notice, such resignation shall take effect upon receipt thereof by the Board of Directors or such officer, and the acceptance of such resignation shall not be necessary to make it effective.

### Section 10 - Removal:

Any Director may be removed with or without cause at any time by the affirmative vote of shareholders holding of record in the aggregate at least a majority of the outstanding shares of the Corporation at a special meeting of shareholders called for that purpose, and may be removed for cause by action of the Board.

### Section 11 - Salary:

No stated salary shall be paid to Directors, as such, for their services, but by resolution of the Board of Directors a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board; provided, however, that nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

### Section 12 - Certain Rights of Directors and Officers:

(a)      No contract or other transaction between this Corporation and any other corporation shall be impaired, affected or invalidated, nor shall any Director be liable in any way by reason of the fact that any one or more of the Directors of this Corporation is or are interested in, or is a director or officer, or are directors or officers of such other corporation, provided that such facts are disclosed or made known to the Board of Directors.

(b)      Any Director, personally or individually, may be a party to or may be interested in any contract or transaction of this Corporation, and no Director shall be liable in any way by reason of such interest, provided that the fact of such interest be disclosed or made known to the Board of Directors, and provided that the Board of Directors shall authorize, approve or ratify such contract or transaction by the vote (not counting the vote of any such Director) of a majority of a quorum, notwithstanding the presence of any such Director at the meeting at which such action is taken. Such Director or Directors may be counted in determining the presence of a quorum at such meeting. This Section shall not be construed to impair or invalidate or in any way affect any contract or other transaction which would otherwise be valid under the law (common, statutory or otherwise applicable) thereto.

(c)      A Director who is not also an officer of the Corporation shall have no responsibility to devote his or her full time to the affairs of the Corporation. Any Director or officer, in his or her personal capacity or in a capacity as an affiliate, employee, or agent of any other person, or otherwise, may have business interests and engage in business activities similar to, in addition to or in competition with those of or relating to the Corporation.

### Section 13 - Committees:

The Board of Directors, by resolution adopted by a majority of the entire Board, may from time to time designate from among its members an executive committee and such other committees, and alternate members thereof, as they may deem desirable, each consisting of two (2) or more members, with such powers and authority (to the extent permitted by law) as may be provided in such resolution. Each such committee shall serve at the pleasure of the Board.

### ARTICLE IV - OFFICERS

### Section 1 - Number, Qualification, Election and Term of Office:

(a)      The officers of the Corporation shall consist of one or more Chief Executive Officers, a President, a Secretary, and a Treasurer, and such other officers, as the Board of Directors may from time to time deem advisable. The President of the Corporation shall be and any other officer may be, a Director of the Corporation. Any two offices (but not more than two) other than President and Secretary may be held by the same person.

(b)     The officers of the Corporation shall be elected by the Board of Directors at the regular annual meeting of the Board following the annual meeting of shareholders. Officers may be appointed by the Board of Directors at any other meeting. The salaries of all officers shall be fixed by the Board of Directors.

(c)     Each officer shall hold office until the annual meeting of the Board of Directors next succeeding his election, and until his or her successor shall have been elected and qualified, or until his or her death, resignation or removal.

### Section 2 - Resignation:

Any officer may resign at any time by giving written notice of such resignation to the Board of Directors, or to the President or the Secretary of the Corporation. Unless otherwise specified in such written notice, such resignation shall take effect upon receipt thereof by the Board of Directors or by such officer, and the acceptance of such resignation shall not be necessary to make it effective.

### Section 3 - Removal:

Any officer may be removed, either with or without cause, and a successor elected by a majority vote of the Board of Directors at any time.

### Section 4 - Vacancies:

A vacancy in any office by reason of death, resignation, inability to act, disqualification, or any other cause, may at any time be filled for the unexpired portion of the term by a majority vote of the Board of Directors.

### Section 5 - Duties of Officers:

Officers of the Corporation shall, unless otherwise provided by the Board of Directors, each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as may be set forth in these Bylaws, or may from time to time be specifically conferred or imposed by the Board of Directors.

(a)     The Chief Executive Officer(s) shall be responsible for strategic planning and integration of corporate policies into day-to-day operations, and one shall also act as the Chairman of the Board. If the Board of Directors appoints more than one Chief Executive Officer, the Board may prescribe such duties, responsibilities and powers to each Chief Executive Officer as it determines appropriate.

(b)     The President shall be responsible for the day-to-day operations of the Corporation and shall report directly to the Chief Executive Officer(s).

(c)     The Treasurer shall have the custody of all books of account and the funds and securities of the Corporation. He or she shall disburse the funds of the Corporation in payment of just demands against the proper vouchers for such disbursements. He or she shall render an annual report to the Board of Directors for the benefit of shareholders concerning the finances of the Corporation. The Treasurer shall perform such other duties as are incidental to his or her office and such as are required by the President or the Board of Directors. The Treasurer shall hold office at the pleasure of the Board.

(d)     The Secretary shall have custody of the seal of the Corporation; shall conduct such correspondence on behalf of the Corporation as shall be required by the President; and shall discharge such additional duties from time to time as may be required by the President or the Board of Directors. The Secretary shall issue all notices required for the holding of meetings of the Board of Directors and of shareholders; shall keep minutes of all meetings of shareholders; shall perform such additional duties as are incidental to the Secretary's office; and shall hold office at the pleasure of the Board.

### Section 6 - Sureties and Bonds:

In case the Board of Directors shall so require, any officer, employee or agent of the Corporation shall execute to the Corporation a bond in such sum, and with such surety or sureties as the Board of Directors may direct, conditioned upon the faithful performance of his or her duties to the Corporation, including responsibility for negligence and for the accounting for all property, funds or securities of the Corporation which may come into his or her hands.

### Section 7 - Shares of Other Corporations:

Whenever the Corporation is the holder of shares of any other corporation, any right or power of the Corporation as such shareholder (including the attendance, acting and voting at shareholders' meetings and execution of waivers, consents, proxies

or other instruments) may be exercised on behalf of the Corporation by the President or such other person as the Board of Directors may authorize.

### Section 8 - Compensation of Officers:

The officers shall receive such salary or compensation as may be fixed and determined by the Board of Directors. Any payments made to an officer of the Corporation such as a salary, commission, bonus, interest, rent or entertainment expense incurred by him or her, which shall be disallowed in whole or in part as a deductible expense pursuant to the Internal Revenue Code of 1986, as amended, as applicable to the U.S. Virgin Islands, shall be reimbursed by such officer of the Corporation to the full extent of such disallowance. It shall be the duty of the Directors, as a Board, to enforce payment of each such amount disallowed. In lieu of payment by the officer, subject to the determination of the Directors, proportionate amounts may be withheld from future compensation payments until the amount owed to the Corporation has been recovered.

### ARTICLE V - SHARES OF STOCK

### Section 1 - Certificates of Stock:

(a)      The Corporation may have certificated or uncertificated shares, or both, as designated by resolution of the Board of Directors. Every owner of certificated shares of the Corporation shall be entitled to a certificate, to be in such form as shall be prescribed by the Board of Directors, certifying the number of shares of the Corporation owned by such shareholder. Within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send to the new shareholder the information required to be stated on certificates. Every owner of uncertificated shares shall, upon written request to the Corporation, be entitled to certificated shares in place of uncertificated shares, in the same form as that prescribed by the Board of Directors for owners of certificated shares.

(b)      The certificates representing shares of the Corporation shall be in such form as shall be adopted by the Board of Directors, and shall be numbered and registered in the order issued. They shall bear the holder's name and the number of shares, and shall be signed by (i) the Chairman of the Board or the President, and (ii) the Secretary or Treasurer, or any Assistant Secretary or Assistant Treasurer, and shall bear the corporate seal.

(c)      No certificate representing shares shall be issued, nor shall any person be registered in the books of the Corporation as a shareholder, until the full amount of consideration therefor has been paid, except as otherwise permitted by law.

(d)      To the extent permitted by law, the Board of Directors may authorize the issuance of fractional shares which shall entitle the holder to exercise voting rights, receive dividends and participate in liquidating distributions, in proportion to the fractional holdings; or it may authorize the payment in cash of the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined; or it may authorize the issuance, subject to such conditions as may be permitted by law, of scrip in registered or bearer form over the signature of an officer or agent of the Corporation, exchangeable as therein provided for full shares, but such scrip shall not entitle the holder to any rights of a shareholder, except as therein provided.

### Section 2 - Lost or Destroyed Certificates:

The holder of any certificate representing shares of the Corporation shall immediately notify the Corporation of any loss or destruction of the certificate representing the same. The Corporation may issue a new certificate in the place of any certificate theretofore issued by it, alleged to have been lost or destroyed. On production of such evidence of loss or destruction as the Board of Directors in its discretion may require, the Board of Directors may require the owner of the lost or destroyed certificate, or such owner's legal representatives, to give the Corporation a bond in such sum as the Board may direct, and with such surety or sureties as may be satisfactory to the Board, to indemnify the Corporation against any claim, loss, liability or damage it may suffer on account of the issuance of the new certificate. A new certificate may be issued without requiring any such evidence or bond when, in the judgment of the Board of Directors, it is proper so to do.

### Section 3 - Transfer of Shares:

(a)      Transfers of shares of the Corporation shall be made on the share records of the Corporation only by the holder of the record thereof, in person or by his or her duly authorized attorney, in such manner as the Board of Directors or any officer of the Corporation may prescribe or upon surrender of the certificate or certificates representing such shares if certificated, with an assignment or power of transfer endorsed thereon or delivered therewith, duly executed, with such proof of the authenticity of the signature and of authority to transfer and of payment of transfer taxes as the Corporation or its agents

may require. Transfer of uncertificated shares of the Corporation shall occur upon providing the Corporation a duly executed assignment covering such shares along with proof of the authenticity of the signature and of authority to transfer and of payment of transfer taxes as the Corporation or its agents may require.

(b)     The Corporation may treat, as the absolute owner of shares of the Corporation, the person or persons in whose name shares are registered on the books of the Corporation and, accordingly, shall not be bound to recognize any legal, equitable or other claim to or interest in, such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise expressly provided by law.

### Section 4.- Record Date:

In lieu of closing the share records of the Corporation, the Board of Directors may fix, in advance, a date not exceeding fifty (50) days, nor fewer than (10) days, as the record date for the determination of shareholders entitled to receive notice of, or to vote at, any meeting of shareholders, or to consent to any proposal without a meeting, or for the purpose of determining the shareholders entitled to receive payment of any dividends, or allotment of any rights, or for the purpose of any other action. If no record date is fixed, the record date for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the day next preceding the day on which notice is given, or, if no notice is given, the day on which the meeting is held, except that the record date for determining the eligibility of shares to be voted on at any election for Directors, shall be no fewer than twenty (20) days next preceding such election of Directors; the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the resolution of the Directors relating thereto is adopted. When a determination of shareholders of record entitled to notice of or to vote at any meeting of shareholders has been made as provided for herein, such determination shall apply to any adjournment thereof unless the Directors fix a new record date for the adjourned meeting.

## ARTICLE VI - DIVIDENDS

Subject to applicable law, dividends may be declared and paid out of any funds available therefor, as often, in such amounts, and at such time or times as the Board of Directors may determine.

## ARTICLE VII - FISCAL YEAR

The fiscal year of the Corporation shall be fixed by the Board of Directors from time to time, subject to applicable law.

## ARTICLE VIII - CORPORATE SEAL

### Section 1 - Seal:

The Corporate seal shall be in such form as shall be approved from time to time by the Board of Directors. The Board of Directors may authorize one or more duplicate seals and provide for the custody thereof.

### Section 2 - Affixing Seal:

Whenever the Corporation is required to place its corporate seal to a document, it shall be sufficient to meet the requirements of any law, rule or regulation relating to a corporate seal to impress, affix or reproduce a facsimile thereof adjacent to the signature of the authorized officer.

## ARTICLE XI - AMENDMENTS

### Section 1 - By Shareholders:

All Bylaws of the Corporation shall be subject to alteration or repeal, and new Bylaws may be made, by the affirmative vote of shareholders holding of record in the aggregate at least a majority of the outstanding shares entitled to vote in the election of Directors at any annual or special meeting of shareholders, provided that the notice or waiver of notice of such meeting shall have summarized or set forth in full therein the proposed amendment.

### Section 2 - By Directors:

The Board of Directors shall have power to make and adopt Bylaws of the Corporation, except that the Board of Directors shall have no power effectively to change the quorum for meetings of shareholders or of the Board of Directors, or to effectively change any provisions of the Bylaws with respect to the removal of Directors or the filling of vacancies in the Board resulting

from removal by the shareholders; provided, however, that the shareholders entitled to vote with respect thereto as in this Article IX above- provided may alter, amend or repeal Bylaws made by the Board of Directors. If any Bylaw regulating an impending election of Directors is adopted by the Board of Directors, that effectively amends or repeals a regulation concerning the method, notice, quorum necessary or otherwise substantially affecting the means for conducting an impending election of the Board of Directors, there shall be set forth in the notice of the next meeting of shareholders for the election of Directors, the Bylaw so made and adopted together with a concise statement of the changes made.

## ARTICLE X - INDEMNITY

Any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he or she is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall (in the case of any such Director or officer of the Corporation) and may (in the case of any such other director or officer or any such employee or agent) be indemnified by the Corporation against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, he or she had no reasonable cause to believe his or her conduct was unlawful.

The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

Any indemnification under the foregoing provisions shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of a director, officer, employee or agent is proper in the circumstances because he or she had met the applicable standard of conduct set forth above. Such determination shall be made by the Board of Directors by a majority vote of a quorum consisting of Directors who were not parties to such action, suit or proceedings, or if such a quorum is not obtainable, or even if obtainable and the quorum of disinterested Directors so directs, by independent legal counsel in a written legal opinion, or by the shareholders. For purposes of the preceding sentence, unless such counsel renders such an opinion to the effect that such indemnification is not proper in the circumstances, then such counsel shall be deemed to have rendered such an opinion to the effect that such indemnification is proper in the circumstances.

Expenses incurred in defending a civil or criminal action, suit or proceeding shall (in the case of any Director or officer of the Corporation) and may (in the case of any such other director or officer or any such employee or agent) be paid by the Corporation in advance of the final disposition of such action, suit or proceeding as authorized by the Board of Directors in the specific case upon receipt of an undertaking by or on behalf of the Director, officer, employee or agent to repay such amounts unless it shall ultimately be determined that he or she is entitled to be indemnified by the Corporation as herein authorized.

The indemnification herein provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any bylaw, agreement, vote of shareholders or disinterested Directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a Director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him or her in any such capacity or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions above set forth.

For purposes of this Article, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture trust or other enterprise, shall stand in the same position under the provisions of this Section with respect to the

resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

The amount of indemnity to which any officer, employee or agent may be entitled shall be fixed by majority vote of the Board of Directors. In any case in which there is less than a quorum, then said amount of indemnity shall be fixed by the vote of a majority of the Directors although less than a quorum.

ARTICLE XI - SOLE AND EXCLUSIVE FORUM FOR CERTAIN ACTIONS

The Superior Court of the U.S. Virgin Islands (or, if the Superior Court does not have jurisdiction, another U.S. Virgin Islands court or, if no U.S. Virgin Islands court has jurisdiction, the United States District Court of the Virgin Islands - St. Croix Division) shall be the sole and exclusive forum for the following matters, in all cases subject to the court's having personal jurisdiction over all indispensable parties named as defendants:

    (i)    any derivative action or proceeding brought on behalf of the Corporation

    (ii)    any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or other employee of the Corporation to the Corporation or the Corporation's shareholders;

    (iii)    any action asserting a claim against the Corporation or any of its current or former directors, officers or other employees arising pursuant to any provision of (x) the General Corporation Law of the U.S. Virgin Islands, (y) the Amended and Restated Articles of Incorporation of the Corporation, including without limitation any certificate of designations for any series of preferred stock of the Corporation, or (z) these Bylaws (in each case (x) through (z), as may be amended from time to time); or

    (iv)    any action asserting a claim against the Corporation or any of its current or former directors, officers or other employees governed by the internal affairs doctrine of the U.S. Virgin Islands, as in effect from time to time.

Notwithstanding the foregoing, any person proposing to commence any action specified in clause (i), (ii), (iii) or (iv) of the next preceding sentence may request in writing that the Corporation waive this Article XI and consent to an alternative forum for such action specified in such request, and a majority of the entire Board of Directors, acting on behalf of the Corporation, may, in its sole and absolute discretion, consent in writing to the selection of such specified alternative forum for such action, in which case such specified alternative forum shall be the forum for such action, in all cases subject to such forum having personal jurisdiction over all indispensable parties named in such action. Neither the Board of Directors nor the Corporation shall be required to give or disclose any reason for any refusal to grant such waiver and consent.

Any person or entity that at any time holds (by purchase or any other acquisition) an interest in shares of any class or series of capital stock of the Corporation (including any "beneficial owner", within the meaning of Section 13(d) of the United States Securities Exchange Act of 1934, as amended) shall be deemed:

    (i)    to have notice of, and to have consented to and agreed to comply with, the provisions of this Article XI; and

    (ii)    to have consented to the personal jurisdiction of the relevant court referred to in the first paragraph of this Article XI in any proceeding brought to enjoin any action by that person or entity that is inconsistent with the exclusive jurisdiction provided for in this Article XI.

If any action the subject matter of which is within the scope of this Article XI is filed in a court other than as specified above in the name of any shareholder, such shareholder shall be deemed to have consented to:

    (i)    the personal jurisdiction of the Superior Court of the U.S. Virgin Islands, in connection with any action brought in any such court to enforce this Article XI (by removal or otherwise); and

    (ii)    having service of process made upon such shareholder in any such action by service upon such shareholder's counsel in the action as agent for such shareholder, in addition to any other valid service of process.